UTICA,
August, 1829.

Jaques
v.
Todd.

S. & I Jaques *vs.* Todd.

This was an action of assumpsit, tried at the New-York circuit, in October, 1827, before the Hon. Reuben Hyde Walworth, then one of the circuit judges.

The declaration contained the common counts for goods sold and delivered, and the money counts. The defendant pleaded the general issue, and gave notice of set-off.

A witness for the plaintiff testified, that in August, 1825, he was employed as a measurer on board of Ship Rebecca, lying at Brooklyn, the cargo of which was salt, owned by the plaintiffs. That he delivered to the sloop "Ambassabor," lying along side of the ship, 1500 bushels of Turk's Island salt, for which the person acting as master signed a receipt, on the back of the order. The order was produced, and is in these words: "Ship Rebecca at Brooklyn. The measurer will please deliver Mr. E. M. Todd, pr. bearer, fifteen hundred bushels Turk's Is. salt, and oblige (signed) S. & I. Jaques. 13th August, 1825. 1500 Bus. Sloop Ambassador." The receipt endorsed, " Rec'd the contents of the within order," signed "Daniel McGuire." It was proved that the sloop "Ambassador" was owned by the defendant; that McGuire, who is since deceased, was her master; that the cargo of the sloop was received by the defendant at Waterford, where he then resided; and that the price of the salt was fifty-two cents per bushel. The plaintiffs rested.

On the part of the defendant, James Bailey was sworn as a witness, who testified, that he, as a member of the house of Bailey and Voorhees, in August, 1825, bought of the plaintiffs the salt in question. That the house of Bailey and Voorhees had orders from the defendant to buy 1000 bushels of salt for him, and that on the suggestion of McGuire, the captain of the defendant's sloop, he increased the quantity to

*Where the course of business between a merchant in the country and a merchant in town is such, that the country merchant transmits to his correspondent in town his produce and such other articles as he has to sell, and the merchant in town, in return, supplies him with such articles of merchandise as he deals in, and fills up his orders by procuring from other merchants on credit such articles as he does not deal in, and charges them to the merchants in the country, the latter is not liable to the seller for any articles thus procured, although he directs the purchase of an article which he knows the merchant in town does not deal in, and the seller is informed for whom the purchase is made if the merchant in the country has funds in the hands of the merchant in the city, and has never authorized him to pledge his credit on the purchase of any articles thus ordered, or recognized such act. The agency in such case is special, without authority to pledge the credit of the principal.*

1500 bushels. At the time of the purchase he told the plaintiffs he was going to send the salt to the defendant, and wished it to be delivered on board the defendant's sloop, of which McGuire was captain; that the defendant was known to the plaintiffs as a man of high responsibility; that he bought the salt for the defendant on a credit of four months; that he bought it on his own responsibility; that he did not use the credit of the defendant, and had no authority to purchase on his credit; that he never purchased for the defendant on the credit of the defendant, and that in no instance had he ever been authorized by the defendant to pledge or use defendant's credit; that he almost always had funds of the defendant in his hands, as he was in the habit of receiving and selling his produce, and at the time of the purchase in question was indebted to the defendant $1500, the avails of articles remitted to his house to be sold ; that the defendant usually dealt with his house, who sold him such articles as he needed and they had, and such as they had not and he ordered, they went out and purchased for him on their own responsibility, and charged to him ; that when the defendant ordered the salt, he knew that Bailey and Voohees did not keep it for sale; frequently when the defendant sent them cash to purchase articles which they had not themselves, they purchased the articles on their own responsibility on credit, and charged them to him at cash prices, and had the benefit of the credit themselves ; that they were known as the general agents of the defendant in New-York ; that at the time of the purchase of the salt in question of the plaintiffs, nothing was said as to its being on the account and credit of Bailey and Voorhees or on the defendant's account and credit, but it was his understanding that the purchase was for the notes of Bailey and Voorhees, in the same manner as previous purchases had been made: that the house of Bailey and Voorhees had often bought salt for the plaintiffs from the defendant, and had given their own notes therefor; that they always purchased on their own responsibility ; that the bills of parcels would sometimes not be sent in, until by the lapse of the term of credit the paper to be given would be bankable when the paper would be sent for and they would give their

notes ; that sometimes the plaintiffs would wait until the credit had entirely expired, when on sending in the bills they would receive the money or a check ; that the defendant was in the habit of buying salt himself of the plaintiffs, and on making such purchases, would draw in favor of the plaintiffs on Bailey and Voorhees, who accepted his drafts ; that the house of Bailey and Voorhees failed on the 17th October, 1825 ; that their credit was good up to the time of their failure, but they were much pressed for money ; that the defendant knew the salt in question came from the plaintiffs ; that it had never been charged by Bailey and Voorhees to him, because no bill of parcels had been rendered to witness, he never making but one entry of those transactions, and always waiting till the bills came in before he debited the defendant ; that no bill of this salt ever was rendered by the plaintiffs, to his house, it having stopped payment as above stated. Salt is usually purchased on a credit of four months.

This witness further testified, that at the same time he purchased the salt in question, a quantity was bought by him of the plaintiffs, for John Stewart, which was parcel of the same purchase ; that he bought it at the request of Stewart, the house of Bailey and Voorhees being indebted to him ; and that Stewart afterwards gave his note to the plaintiffs for his part of the purchase.

Another witness for the defendant testified, that in August, 1825, he proposed to buy salt of the plaintiffs, who said he might have it on the same terms they had sold a lot to Bailey and Voorhees ; that on the day of the failure of Bailey and Voorhees he met one of the plaintiffs and they spoke of the failure. Witness asked him if he would loose any thing by them, to which he replied he was afraid he should ; that they had purchased two parcels of salt of him to go up the river, one for *Todd* and one for another man, but he should try to saddle it on Todd ; to which witness answered, he would have hard work to do that, as Todd was a hard one.

The plaintiffs proved, that in August, 1825, they had no clerk in their employ. Their books of account were then

UTICA,
August, 1829.

Jaques
v.
Todd.

UTICA,
August, 1829.

Jaques
v.
Todd.

produced and identified, i. e. a blotter and a ship book, the blotter containing entries made on the day of the sale of articles sold, and the ship-book containing entries also made at the time the transactions took place, used as a check to shew the cargoes sold. These books were identified by a witness who had been a clerk of the plaintiffs, and left their employ in July, 1825, and testified, that before he left the plaintiffs they expressed their doubts of Bailey and Voorhees' credit; that Bailey and Voorhees applied very often to borrow money of the plaintiffs, who declared themselves uneasy about them, and that they were unwilling to lend, and yet unwilling to refuse. The general credit of the plaintiffs' books for correctnes was shewn. The following entries were then read from the *blotter* :

| | | |
|---|---|---|
| Delivered 23d. Note rec'd 20 Oct. Entered. | John Stewart, - - - - - 4 mos. 500 Bus. Turks I. Salt (Rebecca) *a* 52 *c.* for his draft 4 mos on Bailey & Voorhees Sloop Volunteer, - Capt. Rynders | 260 |
| Delivered 15th. Entered. | Eli M. Todd, 4 mos. for draft on B. & V. 1500 Bus. Turks I. Salt (Rebecca) *a* 52 *c.* Sloop Ambassador, - - McGuire. | 780 |

And from the *ship-book* :
No. bushels Turks Is'd salt out ship Rebecca, bo't of O. Mauran.

| | |
|---|---|
| Aug. 15. Sloop Ambassador, Capt McGuire, for Eli M. Todd, | 1500 |
| 18. Sloop Belona, &c. | 200 |
| 22. Scow Washington, &c. | 500 |
| 23. Sloop Champlain, &c. | 1000 |
| " Sloop Volunteer, Capt. Rynders, for John Stewart, | 500 |

John Stwart testified, that he directed the purchase of salt in August, 1825 ; that his brother left orders with Bailey and Voorhees to make the purchase; that the salt came up by Capt. Rynders, who brought a bill from plaintiffs, to-

gether with a note for the amount for him to sign, which he signed and sent to plaintiffs. A clerk of the defendant in August, 1825, was called by the plaintiffs, who testified that the defendant usually received bills of parcels of goods sent to him, but he had no recollection of ever seeing or hearing of any bill for the salt in question. Two letters from the plaintiffs to the defendant, calling on him for a note for the 1500 bushels of salt, were read in evidence, bearing date the 3d November, and the 1st December, 1825, and an answer of the defendant of the date of 6th January, 1826, acknowledging the receipt of those letters, and saying that in 10 or 12 days he would be in New-York and would do himself the honor of waiting upon the plaintiffs.

The judge charged the jury, that to entitle the plaintiffs to recover, they must shew, either that the house of Bailey and Voorhees were the general agents of the defendant to make purchases on his credit, or that he had authorized them to make this particular purchase on his credit, or that he had subsequently ratified their act ; that if the jury were satisfied from the testimony that both parties understood at the time of the purchase that the salt was bought on the sole credit of Bailey and Voorhees the question of agency would not arise ; that having funds in their hands to more than the amount of their purchase on the order of the defendant, and the salt coming to his use, would not make him liable ; that the testimony of Bailey negatived the conclusion that the defendant ever authorized Bailey and Voorhees to pledge his credit for the purchase, or that he had ever given them a general authority for that purpose, or that he had subsequently sanctioned the act, and if the jury believed his testimony, which was unimpeached, the purchase was on account of Bailey and Voorhees, and not of the defendant ; that it was a common practice for merchants in the city to fill up the orders of their customers, and if the customer never authorized or intended his credit to be pledged to a third person, it would be unreasonable to make the customer responsible to every person of whom the merchant had purchased, especially when, as in this case, the customer had sufficient funds

in the hands of the merchant; but if he was in the habit of permitting the merchant to purchase on his credit, he would be liable, whatever might be the situation of their accounts, or whatever might be his intention in the particular instance; that the books of the plaintiffs had been admitted in evidence, but were not to be considered as legal evidence of the sale of the salt to the defendant. Books of account were sometimes evidence of a sale and delivery of goods, but they were evidence only in the absence of witnesses to the facts to which they related. In the present case, the jury had the evidence of Mr. Bailey, the person acting at the time; all the books proved was, the understanding of the plaintiffs, which could not charge the defendant, if Bailey and Voorhees were not authorized to purchase on his credit.

The counsel of the plaintiffs excepted to this charge, and requested the judge to charge the jury, that under the circumstances of this case, Bailey and Voorhees were authorized, as agents of the defendant, to make the purchase in question: and that unless there was an express agreement to look to Bailey and Voorhees, exclusive of the responsibility of the defendant, the latter was liable; which the judge refused to do. The plaintiffs' counsel again, excepted. The jury found a verdict for the defendant, which was now moved to be set aside.

*D. Lord, jun.* for plaintiffs. Bailey and Voorhees could not have claimed the purchase of the salt on their own account. They could not have charged the defendant a profit. They would not have been liable for the loss of the article; the property had vested in the defendant. An action could not have been maintained against them by the plaintiffs, the original entry being against the defendant; as between them and the defendant they were simply his agents. Whether Bailey and Voorhees were authorized or not to purchase on the defendant's credit is entirely immaterial, the fact being shewn that they acted on his behalf, and for his benefit. When an agency is established, the principal is liable, although it does not expressly appear that the credit of the principal was authorized to be pledged. The principal is charged be-

cause he has the selection of his agent, and therefore cannot complain when he abuses his trust. (1 Campb. N. P. 85, 109. 1 Ld. Raym. 224. 5 Esp. R. 76.) The fact that nothing was said at the time of the purchase to whom the credit was given, when it was admitted that the plaintiffs were told that the purchase was made for the defendant, establishes the liability of the defendant. Bailey says he understood the purchase to be for the notes of his firm. The books of the plaintiffs show that they understood the purchase to be on the defendant's liability ; but the rights of the parties must be determined by the understanding of both parties, by the contract made between them, or the contract made by the law upon the facts disclosed. (1 Cowen, 359.)

*D. B. Tallmadge & S. Staples*, for defendant. Bailey and Voorhees never acted as the agents of the defendant, notwithstanding the testimony of the witness (Bailey) that his house were known as his general agents in New-York. The meaning of the witness is to be gathered from the whole of his testimony, from which it is manifest that they were not such agents. Bailey and Voorhees had, in repeated instances, purchased salt of the plaintiffs for the defendant, and given their own notes. The case is not to be distinguished from that of a master sending out a servant with cash to make purchases, who, instead of paying out the money, obtains the property on the credit of his master ; in which case it will not be pretended that the master would be liable. The power of an agent should not rest on intendment, but be conclusively shewn ; as when a person is sought to be charged as a partner, the proof must be positive. It is conclusively shewn that Bailey and Voorhees were always in funds for the defendant, which is the governing principle. (Paley's Principal and Agent, 141. 5 Esp. R. 76.)

*D. B. Ogden*, in reply. An agent is one who is employed to do an act for another. Bailey and Voorhees were employed to make a purchase for the defendant ; they therefore were his agents. They never charged the defendant with the salt. The allegation of the defendant that he had funds

in the hands of his agents which they did not pay over, will not help him. There are two classes of cases on this subject; one where the agent acts in his own name, and the principal is not known at the time of the purchase; there the principal, when discovered, may be charged: the other, where the seller knows that the purchaser acts as agent. In such case the principal is liable of course, unless it be affirmatively shewn that the credit was given to the agent. Whether an agent has authority to purchase on credit, is a question of law and not of fact. The judge therefore ought not to have refused to instruct the jury on that point.

*By the Court,* MARCY, J. This case turns on the nature and extent of the authority of Bailey and Voorhees, as agents of the defendant. If they were his *general* agents; if they were *special* agents, and the act done by them was within the scope of their powers; if in any instance they had in fact pledged his credit, and he had recognized their right to do so; or if he had, subsequent to the purchase, in any way, however slight, indicated his assent to the pledge of his credit, in this particular case he is liable to the plaintiffs on the demand for which this action is brought.

The nature of this agency is to be gathered from the connection existing between the defendant and Bailey and Vorhees. It appears the defendant was in the practice of consigning to them whatever produce he had for the New-York market. They sold it and gave him credit therefor. He purchased of them the goods which he required for his store at Waterford. He often sent to them for articles which he knew they did not usually keep, and was aware that they had to purchase them to supply his order; but these purchases were uniformly made in the name and on the responsibility of Bailey and Voorhees. Although Mr. Bailey states his house were the general agents of the defendant in New-York, and were known to be such, this part of his testimony is to be taken in connection with what he had before said in relation to the agency. He had previously declared that the article in question was purchased on his own responsibility for the defendant; that he had never used, or had authority

to use the credit of the defendant, in any instance whatever. Do these facts make out a general or a special agency ? The distinction between a general and special agent is not always obvious : indeed, to trace the line that separates them is sometimes a matter of great nicety ; and I apprehend that the principal difficulty in this case relates to this distinction. " By a general agent is understood, not merely a person substituted in the place of another for transacting all manner of business, (since there are few instances, in common use, of an agency of that description,) but a person whom a man puts in his place to transact all his business of a particular kind ; as to buy and sell certain kinds of wares, to negotiate certain contracts, and the like." (*Paley on Agency ch. 3. sec. 5.*) A person employed by another for a particular purpose, and acting under limited and circumscribed powers, is a special agent, and cannot bind his principal by any act exceeding the precise limits of his authority. (2 *Saunders on Pl. and Ev.* 732.) A factor, employed to sell goods, cannot pledge them. (id. 735.) A person, employed to sell articles at auction, at not less than a stated price, cannot, it is said, sell them at private, sale, even for a price beyond that fixed for the sale at auction. (Ambl. 498.) A principal who agrees to accept, and authorizes his agent to draw bills for advances on merchandise purchased for and consigned to him by such agent, is not liable for bills drawn on him by the agent, on account of his own property consigned to the principal. (1 Peters, 264.) A distinction is to be taken also between a special agent and a general agent, with instructions private or unknown to the person dealing with him, limiting and controlling, in particular instances, the exercise of his general powers. If Bailey and Voorhees had been constituted the agents of the defendant, with the power to buy and sell for him, but were directed not to buy on credit when they had funds belonging to him, they would have been general agents ; and if they had disregarded the instructions of their principal, and actually pledged his credit while they held his funds, he would have been bound by their acts, and it would have availed him nothing to shew that they had transgressed the limits prescribed to them. In such a case, the power to pur-

chase on credit would have existed in the agents ; but its exercise would be controlled by instructions, and dependent on circumstances not presumed to be generally known. But if the defendant, in constituting them agents, had withheld from them, under all circumstances, the authority to buy on his responsibility, or even to buy at all for him unless they were furnished with funds for immediate payment, they would, in my opinion, be only special agents. The evidence of Bailey is explicit, that his house never had the power to purchase on credit for the defendant.

Their mode of doing business is one that is very common. The merchant in the country sends what articles and produce he has on hand to a merchant in New-York to sell, and transmits to him his orders for such goods as he may require. He is probably aware that there are articles on his order which the merchant to whom it is directed does not usually keep ; but he expects, as the correspondent has his funds, that he will make out the assortment by purchasing on his own account, and perhaps on credit, such articles as his own establishment cannot supply. No country merchant, under such circumstances, supposes that he is committing his fortune to his correspondent, by giving him an unlimited power to use his credit in purchasing goods. From the testimony in this case, taking it altogether, Bailey and Voorhees appear to me to have been special agents, without the power to pledge the credit of the defendant.

If a special character can be given to their agency, consistently with well established principles of law on this subject, it appears to me that it should be done. Prudence on the part of principals requires that they should often make restrictions limiting their responsibility ; and when made in good faith, they should be recognized and upheld with all necessary safe guards for their support, and cautionary regulations to preserve them from perversion or abuse.

If the fact was clearly made out, that the salt was purchased by Bailey and Voorhees on the credit of the defendant, restricted as the agency was, I should consider it an act beyond the scope of their authority, for which the defendant would not be liable. I arrive at this conclusion from a view

of the general character of the agency as detailed in Bailey's testimony.

It is proper to examine more minutely and critically the facts and circumstances relative to the sale of the salt, to see if there is any thing to vary the character of the transaction. The plaintiffs were informed that the salt was purchased for the defendant, and the defendant actually received it. Whether the credit was given to the defendant or to Bailey and Voorhees, is a matter left in some doubt. It would seem, from the entries in the books of the plaintiffs, that the credit was given to the defendant; another quantity sold at the same time, at the instance of Bailey and Voorhees, to Stewart, under somewhat similar circumstances, was charged to him, and not to B. and V. Bailey, however, says he gave no direction to have the salt in question charged to the defendant. He intended to buy it, and supposed he had bought it, on his own credit; he had often bought the same article of the plaintiffs for the defendant; and the previous purchases had always been on the responsibility of his house. From a conversation of the plaintiffs with one of the witnesses, after the failure of B. and V. it is quite evident they doubted the liability of the defendant. It is not so material to know to whom the plaintiffs charged the salt, as it is to ascertain to whom the facts warranted them to make the charge; for the rights of one party are not to be affected by the misapprehension of the other. If the facts relative to the sale are all before us, and there is no reason to suspect they are not, it would seem that in making the charge, on the supposition it was made against the defendant, the plaintiffs looked more to his ability to pay than to these facts. The circumstance that the salt was purchased with a design to be sent to the defendant, and that this was made known to the plaintiffs, does not, in my opinion change the features of this case. There is some ambiguity in the witness' expression that *he purchased the salt for the defendant.* He undoubtedly meant to be understood that he purchased it for the use of, or to be sent to the defendant, but not on his account; for he follow-

UTICA,
August, 1829.

Barker
v.
Mechanic Ins.
Co.

ed this expression immediately by the declaration that he pur-chased it on his own responsibility.

But the defendant had the property, and it is therefore urged that he is liable to pay the plaintiffs for it. The answer to this is two fold. It appears, in the first place, that the plaintiffs did not sell the property to the defendant, but to Bailey and Voorhees: if, however, upon the question of fact, there was any doubt, the other answer is conclusive—Bailey and Voorhees had funds furnished by the defendant, and his order to them was to procure it with these funds. So they understood it, and nothing was then or had been previously done to authorise the plaintiffs to understand it otherwise. If the facts will at all warrant the position that the defendant sent his agents to the plaintiffs to buy the salt, it was with money to pay for it. He can therefore avail himself of the principle, that where money is given to the agent or servant to purchase goods for his principal or master, and he retains the money, and purchases on the credit of his employer, the latter is not liable, unless it can be shewn that sometimes the agent or servant has been permitted to buy on credit, (1 Show. 95. 5 Esp. N. P. Rep. 76. Peake's N. P. 74. Paley on Agency, 140.)

I see no reason to question the correctness of the judge's charge to the jury, or his refusal to charge as the plaintiffs requested. The motion for a new trial must therefore be denied.