JAMES H. MALLORY and others *v.* FRANCIS BURRETT.(*a*)

The carrier with whom a contract for transportation is made, is responsible for the safe carriage of the goods to the place of destination, as fixed in the contract, both on his own route and on the subsequent routes to which the goods may be transferred; and he is not entitled to any additional compensation, although, in consequence of the charges upon the subsequent routes, the whole transportation may cost more than the contract price.

Where an owner delivers his goods to a transportation line, employed in the business of transportation from Cincinnati to New York, undertaking and holding themselves out as prepared, to carry goods through, and on such delivery makes a special contract determining the terms of the carriage; he may insist upon his contract as against any and all persons who may be employed by the Cincinnati line to assist in the transportation. The Cincinnati line has no right to deliver the property over to other independent carriers for transportation, or, if so delivered, the other carriers act in subordination to the contract; and if they acquire any rights as *against* the owner, it is only as agents of the contracting line, under a delegation to them, as such agents, of the interests which have accrued under the contract. *Per* WOODRUFF, J.

The carrier's possession of the goods in course of transportation, imports no authority but that which his contract with the employer has conferred. His very possession as *carrier* is *notice* to all others of some special purpose for which the goods have been entrusted to him, and is sufficient to put all others on inquiry. Their right to demand payment in advance, or to refuse to carry without satisfactory security for such payment, is a sufficient protection to them. *Per* WOODRUFF, J.

*It seems*, that a general delivery of goods to a carrier, whose business is confined to carrying within a limited distance, and forwarding thence, and who neither professes nor contracts to carry further, confers upon him an implied authority to de-

(*a*) NOTE BY REPORTER.—His honor, Judge DALY, was prevented by indisposition and absence from the country, from attending upon the argument and consideration of this appeal, which was brought for the review of his opinion at *nisi prius*. As the other judges did not concur upon the question of affirming or reversing the judgment, no final determination was made upon the merits.

The case is, therefore, without the weight of a judicial decision, except that the opinion of WOODRUFF, J., concurs with that of DALY, J., at *nisi prius;* but it is deemed by the reporter worthy of publication, as embodying an interesting and perhaps valuable discussion upon questions of importance.

The cause was neither re-argued nor carried to the court of appeals; but upon the delivery of the opinions, was discontinued by the plaintiffs, who paid the costs and abandoned the action.

Mallory v. Burrett.

liver the goods to those who succeed him on the route, and to bind the owner to pay them their reasonable compensation, and the same authority is continued to successive lines, who may each pay the freight of the preceding carrier, and collect the whole accumulated freight and charges.

*It seems,* that a contract with a carrier so fully involves personal confidence, that if he entrusts the goods to another carrier, not his servant or agent, nor under his control, he will be responsible under circumstances which might not have involved any liability if the goods remained in his own possession.

Fifty bales of hemp sacks were delivered to a transportation line at Cincinnati, under an agreement that they should be transferred to New York for a stipulated freight to be there paid by the defendant, on delivery to him. On their arrival in New York, they were found to have been damaged to an amount exceeding the stipulated freight. The Cincinnati line, although holding themselves out as carriers to New York, did not, in fact, carry goods further than Buffalo, where it was their custom to deliver them to a transportation company who were in the habit of transporting them to Albany, and there delivering them to a tow-boat line, owned by the plaintiffs, for conveyance to New York. The last two companies were not interested in the Cincinnati company, but were in correspondence with them from the above habit of business. It was the custom for carriers receiving goods proceeding towards their destination, to pay the freight previously incurred on the passage, being re-imbursed therefor, and paid their own freight *by the line of* carriers next receiving and carrying the goods, and so on; the carrier to the place of destination receiving from the consignee the full freight accumulated on the route. In accordance with this custom, the Buffalo company received the goods in question from the Cincinnati line, without actual notice of the special contract, paid their freight, transported the goods to Albany and delivered them to the plaintiffs, who paid the freight of both the preceding lines, and delivered the goods to the defendant in New York. In an action by the plaintiffs for the accumulated freight paid and earned by them,

*Held,* by Woodruff, J., sustaining the ruling of Daly, J., at *nisi prius,* Ingraham, First J., dissenting,

1. That the plaintiffs' recovery must be limited by the sum fixed upon, before the original shipment of the goods, in the contract with the Cincinnati line, although the freight paid by the plaintiffs to the preceding lines, exclusive of the sum charged for their own compensation, exceeded the contract price.

2. That by reason of the damages to the goods, although such damages occurred on the route between Cincinnati and Buffalo, the defendant was entitled, by way of recoupment, to an abatement of the plaintiffs' demand for freight paid by them, and their compensation, to the full extent thereof.

3. That the delivery to and acceptance of the goods by the consignee, did not create any implied contract on his part to pay such demand for compensation and charges paid.


This case came up on the plaintiffs' appeal from a judgment in favor of the defendant, entered at a special term upon

a verdict. The facts are fully set forth in the opinion of WOODRUFF, J.

The cause was tried before DALY, J., who charged the jury, among other things, as follows:

The defendant, as owner of the goods, is not bound to pay the plaintiffs, or any intermediate carrier, any higher rate of freight or charges than he agreed to pay to the party with whom he made the contract, whether the plaintiffs or intermediate carriers knew of such contract or not.

It appears the goods were injured to an amount greater than all the plaintiffs' claim. The freight, therefore, was more than balanced by the damages to the goods, and the defendant is not bound to seek out the company who wrought the injury. He may refuse to pay the plaintiffs, and they must seek redress from the Merchants' Transportation Company, and that company from the preceding one, and so on, until the company that injured the property is reached.

The plaintiffs were not the agents of the defendant, but of the Merchants' Transportation Company.

The contract in this case is termed a bill of lading, and if a transportation company receive goods without a bill of lading, and take them on their way, they do it on their own responsibility. They must make inquiries as to the terms on which the goods have been shipped.

Finally, I cannot satisfy myself, in any point of view, that the plaintiffs can recover in this action, and so charge the jury.

*Joseph L. White* and *Willis Hall*, for the plaintiffs.

I. The only damage proved in this case was done before the goods were received for transportation by the Merchants' Line at Cincinnati, or any other.

II. It is conclusively proved that the plaintiffs, in this case, have not injured the goods. The effect of the decision below is not only to compel the plaintiffs to transport the defendant's goods for him free of charge, but to pay him a large sum of money.

III. The plaintiffs' claim is for two distinct items. 1st. His own freight from Albany to New York. 2d. Cash paid for the previous freights, and charges on the goods from Cincinnati. If they are entitled to either of these items, a new trial must be granted.

IV. The plaintiffs have a legal claim against the defendant to recover freight for transporting the goods from Albany to New York. 1st. By virtue of an *express* contract. The *bill of lading* produced by defendant is evidence of an express contract to pay freight; which, explained by the custom proved in the case, means a promise to pay freight to those who earn it on the line. A third person may maintain an action on a promise made to a second person for his benefit. (Per Buller, *Wordington* v. *Viernon*, 1 Bos. & Pul. 101, n.; *Ellwood* v. *Monk*, 5 Wend. 235.) 2d. By virtue of an *implied contract*, as the plaintiffs were common carriers. "A common carrier is bound to receive and carry all goods offered for transportation, upon offer or tender of suitable compensation." (Story on Contracts, § 757; 2 Kent's Com. 599.) When the law imposes a duty and gives compensation, it may be recovered in assumpsit. (*Stevens* v. *Coster*, 3 Burr. 1408; 1 Espinass. Dig.) 1st. The defendant procures a benefit to be done to his goods, and *takes them*, and avails himself of this benefit. Equity raises an obligation to pay for it. 2d. The law gives the plaintiffs a lien upon the goods, while they remain in his possession, for freight, wharfage, &c. A lien is but a mode of enforcing a pre-existing obligation. By relinquishing the lien, the obligation is not relinquished, especially where, as in this case, the claim is made, and the goods taken subject to it. (*Yorke* v. *Greenough*, 2 Lord Ray'd, 866; see case of Exeter Carrier, cited by Lord Holt.)

V. If the law would not presume a contract from the facts proved in this case, they amounted to evidence of a contract in fact, which should have been left to a jury. (*Allen* v. *Smith*, 8 Cow. 301.) This evidence is, 1st. That the plaintiffs received and transported these goods on the Hudson river, in the ordinary course of their business. 2d. That they had no con-

nection with the previous lines, and no knowledge of any special contract with them, or either of them.   3d. That the defendant took the goods from the plaintiffs after notice of their charges, and without informing them of their special contract with the Merchants' line.

VI. The plaintiffs are in no sense the agents of the Merchants' line in Cincinnati.   They have no connection with it. They did not receive the goods from it.   They knew nothing of any contract with it.   They rendered to the defendant their bill for freight and charges, in their own name, and on their own account.

VII. The Merchants', and their immediate lines, were agents of the defendants so far as an authority may be required to deliver lawful possession of the goods.   Any private conditions, not made known to plaintiffs, cannot be binding upon them.

VIII. The plaintiffs disprove any damage done to the goods while in their possession.   No principle makes them responsible for the conduct of any previous lines, with which they have no connection, and over which they have no power.

*D. D. Lord* and *Daniel Lord*, for the defendant.

I. The delivery of the goods on the bill of lading to the carriers at Cincinnati, was not a constitution of agency, but a contract for transportation to the place of final delivery.   They would be liable for damages on any part of the line, and the freight subject to recoupment.

II. The possession of a carrier is not evidence of unlimited authority to make contracts on the owner's account, inconsistent with his own engagements ; nor to confer any such authority.

III. The possession of the carrier was evidence of a limited duty and authority; every one dealing with him is bound to look to the actual contract of the owner, and cannot claim against it.

IV. The usage stated does not profess to cover the case of freights or charges in violation of the owner's contract.

Mallory v. Burrett.

It was one merely among the carriers, giving to each other authority to advance and receive charges as among themselves, when such charges are valid.

A usage among carriers to enforce in this manner charges in contradiction to the owner's rights, would be unreasonable, illegal, and so invalid.

WOODRUFF, J.—Messrs. Roots and Clark delivered to a transportation line at Cincinnati, Ohio, 50 bales of bagging or hemp sacks, under an agreement in writing that they should be transported to New York and delivered to the defendant for a stipulated freight, to be paid by the defendant on delivery, to wit, $228 80 for freight, and $217 43 charges—together amounting to $446 23.

On the arrival of the goods in New York, they were found to be damaged to an amount exceeding the stipulated freight and charges, and the defendant thereupon refused to pay for the transportation of the goods, or the charges thereon.

The plaintiffs bring this action, and found their claim upon the following allegations, which, for the purposes of this appeal, may be taken as proved.

That the Cincinnati Transportation Line, with whom the contract was made, although they hold themselves out as carriers to New York, do not, in fact, carry goods further than Buffalo, but are in the habit of delivering goods, brought by them to Buffalo, to the Merchants' Transportation Company, to be by them carried eastward, through the canal, to Albany. That the last named company carry goods no further than Albany, but are in the habit of delivering goods brought by them to the Hudson River Tow-boat Line, for transportation down the river to New York.

That the last named two companies are in no wise interested in the Cincinnati line, but are in correspondence with them by the habit of business above mentioned.

That there is and has been for many years a general custom among carriers in New York and westward, on the lakes and the Ohio canals, to this effect. That the line of carriers receiv-

ing goods proceeding towards their destination, pay the amount of freight and charges previously incurred on the passage. This amount, together with their own freight, is reimbursed by the line of carriers next receiving and carrying the goods, and so on; and the carrier to the place of destination, on delivering the goods to the consignee, receives from him the full freight and charges accumulated on the route.

That in accordance with this custom, the Merchants' Transportation Company received the goods in question at Buffalo, from the Cincinnati line, without any actual notice of the special contract, and paid their charges and freight to the amount of $360 43; transported the goods to Albany, delivered them there to the plaintiffs, receiving from them the above sum and $92 80 for freight on the canal—making $453 23. And the plaintiffs having brought the goods to New York, seek to recover from the defendant the last named amount, with $23 20 for freight on the river—making in all $476 43.

That the goods received no damage after they were delivered at Buffalo, but were damaged by being wet before that time.

I assume these facts, because there was evidence to the purport stated, and they were not contradicted, and were assumed on the argument, and thereupon the judge charged the jury, *in terms*, that the plaintiffs were not entitled to recover.

The principal question raised by these facts, and discussed on the trial, were—

1st. Whether, under these circumstances, the defendant could be held liable to pay a greater sum for freight and charges than was stipulated in the contract?

2d. Whether he had a right, as against the plaintiffs, to abate or recoup therefrom the amount of damages sustained on the transportation, even to the extinguishment of the whole claim of the plaintiffs for freight and charges paid?

These questions appear to me to present these more general inquiries:—1st. Whether a party who delivers his goods to a carrier, *upon a special contract* for the carriage, may insist, as against all persons to whose hands they come in course of

Mallory v. Burrett.

transportation, upon the *very terms* of his *contract?* Or, 2d. Whether, on the other hand, such delivery does, *per se*, confer upon the carrier an authority to employ other carriers to aid him in the performance of his contract, and to bind the owner to pay them for rendering such aid?

Unless the mere delivery of goods to a carrier for transportation creates a *right to carry*, which may be negotiated, passing from hand to hand with the possession of the goods, binding the owner notwithstanding the explicit terms of his contract, and notwithstanding even full payment in advance, for transportation, the first of these general inquiries must be answered in the affirmative.

The contract which the carrier makes with his employer is a common law contract. He is bound to perform it in precisely the manner, and to the full extent of his stipulation. The *personal* care and diligence of *himself* or *his own* servants, are pledged to his employer; and he cannot alter his own relation to his employer, in this respect, by employing another carrier in his stead. So truly does this contract involve *personal confidence*, that if he entrusts the goods to another carrier, not under his control as his servant or agent, he will be held responsible, under circumstances which might not have involved any liability if the goods remained in his own possession. (*Garnett* v. *Willan*, 5 Barn. & Ald. 60; *Sleat* v. *Fagg*, Ib. 342.)

If such be the nature of the carrier's undertaking, his possession of the goods, in course of transportation, imports no authority but that which his contract with the employer has conferred. On the contrary, his very possession as *carrier* is *notice* to all others of some special purpose for which the goods have been entrusted to him, and puts all others on inquiry. It may prove, on such inquiry, that he has possession under a general authority, to carry for a limited distance, and then to forward without limit as to terms, other than the customary or reasonable rates. It may also prove that he has no authority beyond carrying himself, or by his own servants, in discharge

of the personal trust or confidence which the employer has not chosen to repose in any other.

This view of the duty and authority of a carrier *within the limits* of *his own line* or *route*, cannot, I apprehend, be denied. It surely cannot be plausibly claimed, that if an owner, for reasons of his own, more or less important, (and of the materiality of which he is rightfully the sole judge,) select one of several carriers on the same route, and entrust to him his goods upon special terms, he thereby clothes such carrier with a general authority to send the goods by another conveyance, not only in violation of the confidence reposed in him, but in such wise as to subject the owner to a liability to which he has in no way consented.

But where the carrier employed is confined within certain limits, and according to the course of his particular business carries only within such limits, and forwards thence by other lines, it may be said with much plausibility, if not with truth, that one who entrusts goods to him which are marked and destined to a point beyond, authorizes him so to forward the goods, and that third persons are not bound to look beyond the mere fact of such possession.

As, if a line running only from New York to Boston, but in the habit of forwarding thence to places beyond Boston, be entrusted with goods addressed to Portland, Maine, carriers from Boston to Portland may rightfully presume, from the usual course of the business of such line, and the fact of possession, an authority so to forward upon the usual and customary terms.

This is in analogy to the ordinary rule in regard to agents engaged in a particular trade or business, and employed by a principal to do certain acts for him in the course of that business; in which case he will have power to bind the principal by all contracts which are within the scope of his ordinary employment, whether he had special private instructions or not. Having been enabled to hold himself out to others as possessing a certain authority, the principal will be bound by its exercise, whatever may have been the actual terms of the em-

ployment itself. (22 Wend. 348—61; 23 Wend. 22 and 280; 3 Wend. 83; 1 Hill, 501; 3 Hill, 279; 5 Hill, 101.)

Had it appeared in the present case that the Cincinnati line, with whom the contract in this case was made, were carriers from Cincinnati to Buffalo only, and forwarders from thence to New York; that this was their usual course of business, and this fact was known to the party forwarding the goods, or so notorious that he must be presumed to have known it, I should be much inclined to hold, that by entrusting the goods to such line, he subjected them to the inferences justly drawn from the course of the carrier's ordinary employment, and that other carriers had a right to act upon the apparent authority thus conferred.

But the testimony does not exhibit such a case. The line at Cincinnati was notoriously engaged in "the transportation of goods and merchandise between *Cincinnati and New York* and intermediate places"—in the habit of undertaking for such transportation through the entire route. The agent held himself out as agent for transportation between Cincinnati and the eastern cities.

Owners of goods did not, therefore, impliedly authorize them to do any thing, save only to carry their goods according to the very terms of their contract, and corresponding lines accustomed to aid them in the carriage must be presumed to know the course of their ordinary business, the nature of their employment, and the limited authority which it conferred.

I perceive no sufficient reason for applying to the carrier, under such circumstances, a rule different from that which would govern the employment of other bailees for hire. And yet it would hardly be claimed that if one employ a farrier to shoe his horse, upon special terms or for a stipulated price, he thereby authorized the farrier to send his horse to another farrier to be shod, and subject the owner to liability upon a totally distinct contract. Such other farrier would have no right to meddle with the horse at all, except as the agent or servant of the first. And it has been held in regard to the *lien* of a mechanic employed to do work upon another's property, that as

the contract is personal, and founded in confidence in the bailee and his servants, so the lien of the bailee is personal, and belongs strictly to him who contracts to do the work, and not to persons employed under him; and that between the owner and the persons last named there is no privity of contract. (*Hollingsworth* v. *Dow*, 19 Pick. 228.) It is not necessary to go to this extent in the present case, nor do I doubt that under the custom shown by the evidence to exist, carriers may successively transfer to each other their claims for freight earned and charges paid to the carriers preceding them, in such a manner as to authorize the last carrier to demand the whole, and detain the goods therefor, when there is a clear liability of the consignee to *pay* the whole amount demanded.

But I cannot resist the conclusion that in the present case, for the reasons above suggested, the plaintiffs and their immediate predecessors in the carriage to New York, are to be regarded as the agents of the Cincinnati line to such an extent that the carriage by them was in subordination to the contract made with such line.

It was insisted on the argument that the plaintiffs were bound, by the nature of their occupation as carriers, to receive and carry the goods; and if so, they have a legal right to demand payment for the performance of their duty. And further, that carriers have a right to waive prepayment, receive and carry goods tendered to them, and exact payment for their services from whomsoever may claim them.

I apprehend that the rule is stated too broadly, and that a carrier is *never bound* to receive or carry goods unless they are tendered for carriage by the owner himself, or by some person who has an express or implied authority to bind him by a contract to pay freight therefor, and that even when so offered, he is not bound to carry, unless payment is tendered. (Cross on Lien, 28, and cases cited; 19 Pick. 230.) This is all that is necessary for his protection. And so long as his right to demand payment in advance is recognized, it is no hardship to require him, when he receives such goods without prepayment, to see to it that the person from whom he receives them has

authority to deliver them for carriage, and to inquire into its extent. Angell on Carriers, §§ 335–8, §§ 363–8.)

It is suggested that if a carrier is required for his own protection to inquire in any case into the authority or terms of the possession of the party who may tender goods for transportation, the ready and convenient transmission of goods from and to distant places in the United States will be greatly hindered. That commercial convenience requires that goods should pass from carrier to carrier over consecutive routes, and that each carrier in the succession shall have assured confidence that his own claim to freight and charges shall be protected.

In practice, the views I have suggested will, I think, work no inconvenience. The goods can always be accompanied with a proper voucher, by which the terms of the carriage or shipment will appear. And when the carriage undertaken embraces the whole extent of the route, they clearly ought to be so accompanied. In that event, corresponding or connecting lines may make themselves parties to the contract or not, at their pleasure. They may rely upon each other, and have recourse to the party upon whose immediate employment they act. Or, if unwilling either to carry in subordination to the contract, or to rely upon the good faith or responsibility of the preceding carrier, they may require prepayment. The result will be, that owners will incur no risk but that which the contract contemplates, and carriers will be left to arrange between themselves the terms and conditions of their correspondence with each other in reciprocal dependence upon the good faith and responsibility of each.

While, on the other hand, if the owner entrusts his goods to a carrier whose ordinary business is confined to carriage within a limited distance, and forwarding thence, such owner may employ at the terminus a forwarding agent or consignee, or leave his goods to be forwarded by the carrier, who in such case would, I think, have an implied authority to bind the owner to those who succeed him on the route.

The case of *Fitch* v. *Gilbert*, in 1 Doug. Mich. R. 1—18, is

an authority directly in point, and the subject is discussed at some length, while the opinion of the court in *Allen* v. *Smith*, 8 Cow. 301, appears to me to sustain the conclusion to which I arrive. Chief Justice Savage, in that case, places the right of the plaintiffs to recover, upon the distinct ground that the jury might infer a promise by the defendant to *pay* the freight to the *plaintiffs*, and he says, "I am disposed to admit, that independent of the conduct of the defendants, the plaintiffs had no claim against them."

On this part of the case my conclusion is, that where an owner delivers his goods to a transportation line—employed in the business of transportation from Cincinnati to New York, holding themselves out as such, and undertaking to carry goods through—and on such delivery makes a special contract, determining the terms of the carriage, he may insist upon his contract as against any and all persons who may be employed by the Cincinnati line, to assist in the transportation. That the Cincinnati line has no right to deliver the property over to other independent carriers for transportation. That if so delivered to other carriers, the latter act in subordination to the contract, and if they acquire any rights as against the owner, it is only as agents of the contracting line, under a delegation to them, as such agents, of the interests which have accrued under the contract.

It follows, therefore, that the plaintiffs' claim in this case was subject to recoupment of the damages sustained by the goods on the passage, wherever such damage was received, and the plaintiffs must seek their reimbursement of charges and their compensation from the party who employed them.

It was urged, however, that the defendant having received the goods after notice that the *plaintiffs* claimed payment of freight and charges, a promise to pay the amount to the plaintiffs might be presumed, or, at least, that such fact ought to have been submitted to the jury for their consideration as evidence of such promise.

If a jury would have been warranted, by the circumstances given in evidence, in finding a binding promise to pay the

plaintiffs the amount, then the case ought to have been submitted to them.

On the arrival of the goods in New York, the plaintiffs sent notice thereof to the defendant, accompanied by a bill of the freight and charges made out in the name of the plaintiffs, and stating their claim thereto; and thereupon the defendant sent for and received the goods.

The case of *Allen* v. *Smith*, 8 Cow. 302, is relied upon as showing that this act of the defendant amounted, as between him and the plaintiffs, to a waiver of his right to refuse payment. In *that* case the consignee was confessedly liable for *some* amount. He only sought an *allowance* from the freight for damages. And the carrier claimed a lien; and as the agent of Hart & Co., if not in his own right, he undoubtedly had a lien, which he may be said to have surrendered on the consignee's receiving the goods and bill of charges without objection. The court thought that good faith required that the consignee should state his objections at the time, and he having full knowledge of all the facts, and having received the goods without objection and without disclosing the facts to the plaintiffs, the court thought there were sufficient grounds for a jury to presume a promise to pay the plaintiffs' charges.

Here the defendant had no knowledge that the goods were damaged until they came into his possession. He took the earliest opportunity to apprise the plaintiffs of that fact after it was discovered.

But what appears to me decisive on this point is, that the defendant had a right to insist on the delivery of his goods without *any* payment. The plaintiffs had no lien thereon to be surrendered. The amount of damage had extinguished all claim for freight and charges, and the defendant could have taken them without the plaintiffs' consent, if they had not voluntarily delivered them. By exercising his clear right to take possession, he certainly did not waive his right to object to the payment of a claim, the payment of which could not lawfully have been made a condition of the delivery of the goods to him, and was not in fact attempted to be made a condition.

I am of opinion that the judgment should be affirmed.

INGRAHAM, FIRST J.—I concede the proposition that, as between the original contracting parties, the carrier, with whom the contract is made, is bound to carry for the price agreed on, and is responsible for the safe carriage of the goods to the place of destination, whether on his own route or on the subsequent routes to which the goods may be transferred.

There can be no doubt, also, that the carrier who makes the contract for transportation would be responsible for all damage arising from an improper discharge of his duty. That for injuries to the goods, either on his own line or on the lines to which he might transfer them, he would have to respond to the owner, and if the transportation cost more than the contract price, the carrier would be bound to indemnify the owner.

But I cannot concur in the opinion that the subsequent carrier, to whom the goods are delivered for transportation, without notice of the contract, is not entitled to claim his freight or charge for transportation, or that he carries the goods subject to a loss of his services by a claim for damages incurred before he received the goods.

The first carrier, with whom the contract was made, was vested by the owner with all necessary authority to forward the goods to New York. True, he agreed to do it for a specified sum, but if he broke such agreement and exposed the owner to a greater charge by the transfer to another person, he must make good the loss. As between the owner and the last carrier, the equity is in favor of the latter. The owner trusted the goods to the first carrier, and by placing them in his possession he would thereby enable him to perpetrate a fraud upon the latter. It was through his act, in the first instance, that the last carrier was ignorantly led to do a service for which he is to receive no compensation. If the owner determined to insist upon his first contract, he should have refused to receive the goods after he knew of plaintiffs' claims for transportation. Having received them, he cannot now refuse to pay for them. Nor do I agree that such last carrier forfeits his charge for carriage, if the goods are damaged on

Mallory v. Burrett.

the previous line.   So far as his rights are involved, I think he is entitled to recover if the goods were delivered in New York in as good condition as when he received them.   All the previous freight may be lost by the amount of damages recouped, and if he takes the transfer of the first carrier's claim for  transportation on his line, he takes it subject to any claim for damages on the part of the owner.

The plaintiffs were entitled to recover their charges for transportation on their line, and if they held the charges of the previous line, and it had been shown that the damage did not occur while the goods were on that line, they would be entitled, I think, to those also.   But as the evidence shows that the goods were damaged before they came to the plaintiffs' possession, the plaintiffs would be bound, in order to relieve the intermediate line from loss, and to recover their charge for transportation, to show that the damage occurred previous to the delivery of the goods to them.   This appears to be so from the testimony.

There is a difficulty in disposing of this case in the present condition of the court.   With a difference between the judges who held the court, considerable delay must take place before an argument can be had before the full bench, in consequence of the illness of one of the judges.

Under such circumstances, I think the parties had better agree to an affirmance of the judgment, so as to allow an appeal at once to the court of appeals, and have the questions upon which we differ finally decided.


Re-argument ordered before the full bench, unless the parties consent to an affirmance *pro forma*, to enable the plaintiffs to appeal to the court of appeals.