[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 127 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 128 
The jury in this case have found, upon sufficient evidence and under proper instructions from the court, that the plaintiffs were holders, for value, of the checks in question. Each of these checks, if duly certified imposes upon the bank an obligation to retain the amount for which the check is drawn, and which, by the certificate, it admits it has in hand to the credit of the drawer to meet the check when presented, and to pay the same to the holder on demand. This obligation is substantially the same as that assumed by the acceptor of an ordinary bill of exchange; and the certificates in this case, if authorized, may with propriety be regarded as virtual acceptances of bills, and the bank as liable, if at all, as acceptor.
The first ground upon which this liability is resisted is based, not upon any want of authority in the particular agent by whom the checks were certified, but upon a want of power in the bank to bind itself by the contract sought to be enforced. It is insisted that the bank was not authorized by its charter to engage in transactions purely fictitious, having no connection with its legitimate business, or to pledge its credit for the mere accommodation of third persons.
The defendant is a banking corporation, organized under the general banking law of this state; and it is, I think, a sound position, that such a corporation exceeds its powers when it becomes the mere surety for another, upon a contract in which it has no interest, or lends its credit in any *Page 129 
form for the exclusive benefit of other parties. Such a contract is ultra vires, and cannot be enforced against the bank by any person cognizant of the facts. But it by no means follows, when the unauthorized contract is in the form of a negotiable instrument, that the bank can avail itself of the defence, as against one who, without notice, has become the holder of the paper for value. This question appears to have arisen in the case of Stoney v. The American Life Insurance Company (11 Paige,
635), and the decision of the court upon the point is thus stated by the reporter: "A negotiable security of a corporation, which upon its face appears to have been duly issued by such corporation, and in conformity with the provisions of its charter, is valid in the hands of a bona fide holder thereof, without notice, although such security was in fact issued for a purpose and at a place not authorized by the charter of the corporation, and in violation of the laws of the state where it was actually issued."
There is a dictum of the chancellor, to the same effect, in the case of Safford v. Wyckoff (4 Hill, 442), where the defence set up was, that the act of the bank, in issuing the bill upon which the action was brought, was ultra vires. The chancellor there says: "A bill, or any other negotiable security, which is not upon its face illegal and unauthorized, is valid in the hands of a bona fide holder, without notice, who has paid a valuable consideration therefor, except in those cases in which the security is made void by statute." So in the case of The GenesceBank v. The Patchin Bank (3 Kern., 309), recently decided by this court, a similar doctrine is distinctly asserted by DENIO, J., although the point was not passed upon by the court.
I have no hesitation in concurring with these learned judges in the principles thus asserted, and am not aware that a contrary opinion has ever been judicially expressed. A citizen who deals directly with a corporation, or who takes its negotiable paper, is presumed to know the extent of its *Page 130 
corporate power. But when the paper is, upon its face, in all respects such as the corporation has authority to issue, and its only defect consists in some extrinsic fact, such as the purpose or object for which it was issued, to hold that the person taking the paper must inquire as to such extraneous fact, of the existence of which he is in no way apprized, would obviously conflict with the whole policy of the law in regard to negotiable paper. I pass, therefore, to the consideration of that branch of the defence which rests upon the want of authority in Peck, the teller, to bind the bank.
In the case of Mussey v. Eagle Bank (9 Metc., 306), the Supreme Court of Massachusetts held not only that such a teller had no original inherent power to certify checks, but that a general custom to that effect among banks would conflict with the public interests, and would be bad. I am not entirely satisfied with the reasoning of the court in that case. The act of certifying a check is simply answering the supposed inquiry, of one about to take the check, whether the bank has funds of the drawer to meet it; and no other officer or agent of the bank would seem to be so competent to give the answer as the paying teller. His duties impose upon him the necessity of knowing the state of every depositor's account. He is charged with all he pays out, and if he pays a check, without funds in hand, he is responsible to the bank for the amount. His knowledge exceeds that of the book-keeper, because, to the information obtained from the latter, he adds a knowledge whether any deposits have been made or checks paid since the last entry in the books. No doubt the cashier, by virtue of his general powers, and his presumed knowledge of all the affairs of the bank, would be competent to answer the question; but he could only do so by first inquiring of the book-keeper and teller. Why should the applicant be compelled to seek the information through this circuitous channel, instead of going directly to the ultimate source of knowledge on the subject? The *Page 131 
teller is put in the place of the cashier, to perform a portion of his duties. His appointment is virtually a division of the office of cashier; and that branch of the office which the teller fills embraces those duties which particularly require a knowledge of the state of the accounts of the depositors. Why then should he not be the organ of communication on that subject?
But it is unnecessary in the present case to decide this question, as it clearly appears not only that the teller, Peck, was in the habit of certifying the checks of customers, with the knowledge of the officers of the bank, but that he was furnished with a book for the express purpose of keeping a memorandum of such checks. His authority to certify, therefore, in a proper case, cannot be disputed. But it is insisted that his power extended only to cases where the bank had funds in hand, he having been expressly prohibited from certifying in the absence of funds, and hence that the bank is not bound.
It may be doubted whether such a prohibition adds anything to the restrictions which would otherwise exist upon the powers of the agent. A teller, acting under a general power to certify checks, would be guilty of an excess of authority and a clear violation of duty, if he certified without funds.
The powers of the cashier himself, or other principal financial officer of the bank, would no doubt be subject to the same limitation. To certify, a check when the bank has no funds to meet it, is to make a false representation; and neither the incidental power of the cashier, nor a general power conferred upon any other officer, could be construed to authorize that. Hence, if a bank is holden, in any case, upon a certificate of its cashier that a check is good, when it has no funds of the drawer, it is not because the cashier is deemed authorized to make such a certificate, but because the bank is bound by his representation, notwithstanding it is false and unauthorized. *Page 132 
It would seem, therefore, that the defence insisted upon here would have been equally available if the checks in question had been certified by the cashier himself. It might then have been urged, with truth, that the cashier had violated his duty and exceeded the proper limit of his powers in making the certificate; and if the argument be sound, that the principal is in no case bound, unless the act of the agent is within the powers either actually or apparently conferred upon him, the bank would not be holden in such a case. It is no more within the apparent power of a cashier to certify that the bank has funds, when it has none, than it is within that of a teller expressly authorized to certify only when the bank has funds. Every person would be bound to take notice of the limitation imposed by law upon the powers of the cashier, or other general agents, no less than of that which is in terms imposed upon the powers of the teller as special agent. Hence, it cannot be pretended that a person who should take and pay value for a check, with knowledge that the bank had no funds of the drawer to meet it, would acquire any valid claim against the bank, although such check was certified by the cashier himself. He would be presumed to know that it was contrary to the duty of the cashier to certify without funds, and this knowledge would have the same effect as that which every one who should take a check, certified by the teller, would be presumed to have of any express restriction upon his powers.
It will be seen that, if these views are correct, the present case does not turn in any degree upon the rules applicable to special agencies, but that the question would have been precisely the same if the check had been certified by the cashier or other principal financial officer of the bank. As they may, however, admit of doubt, I shall treat the case as one of an agency specially restricted, and shall simply inquire whether a bonafide holder, for value, of a negotiable check, certified by a special agent whose authority is limited *Page 133 
to cases where the bank has funds of the drawer in hand, can enforce payment of the check, provided the bank has no such funds.
This is a complex question, depending partly upon the law of principal and agent, and partly upon that of negotiable or commercial paper. The defence assumes that principals are bound only by the authorized acts of their agents, and admits of no qualification of this general rule, except where the agent has been apparently clothed with an authority beyond that actually conferred. But this proposition is too broad to be sustained. Principals have been repeatedly held responsible for the false representations of their agents, not on the ground that the agents had any authority, either real or apparent, to make such representations, but for reasons entirely different. In Hern v.Nichols (1 Salk, 289), the leading case on the subject, where an agent authorized to sell a quantity of silk had made certain fraudulent representations, by which the purchaser was deceived, the principal was held liable. Lord HOLT there said: "Seeing somebody must be a loser by this deceit, it is more reasonable that he that employs and puts a confidence in the deceiver should be a loser, than a stranger." The principle of this case has never, I think, been overruled, but, on the contrary, has been repeatedly approved and confirmed. It will be found directly applicable to the present case. The certificate of the teller is a positive representation that the bank has funds to meet the check. If that representation is false, who ought to bear the loss?
The reasoning of Lord HOLT, in the case of Hern v. Nichols,
applies here with peculiar force. The bank selects its teller and places him in a position of great responsibility. The trust and confidence thus reposed in him by the bank leads others to confide in his integrity. Persons having no voice in his selection are obliged to deal with the bank through him. If, therefore, while acting in the business of the bank, and within the scope of his employment, so far as is known or *Page 134 
can be seen by the party dealing with him, he is guilty of misrepresentation, ought not the bank to be held responsible? It is worthy of consideration that the fact misrepresented in this case is not only one peculiarly within the knowledge of the agent, but one with which he is made acquainted by means of the position in which he is placed by the bank, and which it is his especial province and duty to know, and which could scarcely be definitively ascertained except by application to him. These circumstances would seem to bring the case decidedly within the principles adopted in Hern v. Nichols, and in the subsequent decisions based upon that case.
This conclusion is in no respect in conflict with that doctrine of the law of agency which makes it the duty of all persons dealing with a special agent to ascertain the extent of his powers. It is conceded that every one taking the checks in question would be presumed to know that the teller had no authority to certify without funds. But this knowledge alone would not apprize him that the certificate was defective and unauthorized. To discover that, he must not only have notice of the limitations upon the powers of the teller, but of the extrinsic fact that the bank had no funds; and as to this extrinsic fact, which he cannot justly be presumed to know, he may act upon the representation of the agent. There is a plain distinction between the terms of a power and facts entirely extraneous, upon which the right to exercise the authority conferred may depend. One who deals with an agent has no right to confide in the representation of the agent as to the extent of his powers. If, therefore, a person, knowing that the bank has no funds of the drawer, should take a certified check, upon the representation of the cashier or other officer by whom the certificate was made that he was authorized to certify without funds, the bank would not be liable. But in regard to the extrinsic fact, whether the bank has funds or not, the case is different. That is a fact which a stranger, who takes *Page 135 
a check certified by the teller, cannot be supposed to have any means of knowing. Were he held bound to ascertain it, the teller would be the most direct and reliable source of knowledge, and he already has his written representation upon the face of the check. If, therefore, one who deals with an agent can be permitted to rely upon the representation of the agent as to the existence of a fact, and to hold the principal responsible in case the representation is false, this would seem to be such a case.
It is, I think, a sound rule, that where the party dealing with an agent has ascertained that the act of the agent corresponds in every particular, in regard to which such party has or is presumed to have any knowledge, with the terms of the power, he may take the representation of the agent as to any extrinsic fact which rests peculiarly within the knowledge of the agent, and which cannot be ascertained by a comparison of the power with the act done under it. The familiar case of the giving of a negotiable partnership note, by one of the partners, for his own individual benefit, affords an apt illustration of this rule. Each of the partners is the agent of the partnership, as to all matters within the scope of the partnership business, and can bind the firm by making, indorsing and accepting bills and notes in such business; but he has no more authority than a mere stranger to execute such paper in his own business, or for the accommodation of others. If he gives the partnership note or acceptance for his own debt, it is void in the hands of any party having knowledge of the consideration for which it is given; but when negotiated to a bona fide holder, the firm is precluded from questioning the authority of the partner, and is effectually bound. The cases in this state by which this doctrine is illustrated and established are numerous and uniform. (Livingston v. Hastie, 2 Caine, 246; Lansing v. Gaine,
2 John., 300; Laverty v. Burr, 1 Wend., 529; Williams
v. Walbridge, 3 id., 415; Boyd v. Plumb, 7 id., 309;Gansvoort v. Williams, 14 id., 133; Joyce v. Williams,id., *Page 136 
141; Wilson v. Williams, id., 146; Catskill Bank v.Stall, 15 id., 364; 18 id., 466, S.C.)
It will be found difficult to distinguish these cases, in principle, from that now before the court. Every person taking the negotiable note or acceptance of a partnership, executed by one of the partners in the name of the firm, is bound to know the extent of the partner's authority to bind the firm, but this obligation does not extend to the consideration for which the note or acceptance was given. If given for the private debt of one of the partners, or for the accommodation of third persons, all the cases agree that the burden of proving the holder's knowledge of that fact rests upon the partnership. That the execution is by an agent is as apparent upon the face of the paper, in such cases, as in that of a certified check; because a partnership can only act in its partnership name, through agents.
The argument resorted to here, therefore, that parties are only bound by the authorized acts of their agents, and that paper issued by an agent without authority is no more obligatory upon the principal than if it had been forged, is just as applicable to partnership notes given by a partner for his individual debts as to these certified checks. The question is not, in such cases, whether the principal is bound by the unauthorized act of the agent, but whether he is estopped, by the representation of the agent, from disputing facts which show that the act was authorized. There is no analogy between these partnership cases, or the case before the court and cases where the paper is forged. The fact of the agency, and the trust and confidence reposed by the principal in the agent, create a broad line of distinction between them; and it is this trust and confidence which constitute the foundation of the liability, and which justify the party dealing with the agent in relying upon his representation in respect to facts especially within the agent's knowledge. The giving of a note in the partnership name, by one of the partners, is a virtual representation that it is given in the partnership *Page 137 
business, and, if negotiable, this representation is deemed in law to have been made to every subsequent bona fide holder of the note. The State of Illinois v. Delafield (8 Paige, 527;S.C. in error, 2 Hill, 159) is another illustration of the same principle. An agent of that state was authorized to dispose of certain bonds, but was not to sell them below par or on credit. He sold them to Delafield on time and at a sacrifice. The state filed a bill against Delafield for relief, and applied to the Court of Chancery for an injunction to restrain the defendant from negotiating the bonds, on the ground that if negotiated the state would be liable to pay them. The defendant's counsel insisted that if the bonds were void in the hands of Delafield they would be equally so in the hands of any person to whom he might transfer them. The chancellor, nevertheless, granted the injunction, saying that, if the securities should pass into the hands of a bona fide holder, the state would be equitably and legally bound to pay them. On appeal to the Court for the Correction of Errors, the decision of the chancellor was affirmed by a nearly unanimous vote.
It would be difficult, I think, to discover any valid distinction, in principle, between this case and the one we are considering. The purchaser of the bonds from Delafield would, equally with Delafield himself, be presumed to know the limits of the authority conferred upon the agent; but it must have been held that he would not be bound to inquire as to the extrinsic facts attending the sale or negotiation of the bonds.
The principle is well stated in the following proposition, submitted to and approved by the court, in the case of The NorthRiver Bank v. Aymar (3 Hill, 262): "Whenever the very act of the agent is authorized by the terms of the power, that is, whenever, by comparing the act done by the agent with the words of the power, the act is in itself warranted by the terms used, such act is binding on the constituent, as to all persons dealing in good faith with the agent. Such *Page 138 
persons are not bound to inquire into facts aliunde; the apparent authority is the real authority."
The opinion of Mr. Justice NELSON, who dissented from the majority of the court in this case, cannot be reconciled with the principle maintained by the same judge in Boyd v. Plumb andGansvoort v. Williams (supra). The cases are strictly parallel. In that of Aymar, the power of the attorney was limited to the giving of notes, for the use of the principal; in the others, the authority of the partner was limited to the execution of paper, for the use and benefit of the partnership; in both, the plaintiffs were regarded by the judge as equally cognizant of the limitations of the power; and yet, in the cases of Boyd v. Plumb and Gansvoort v. Williams, he held that the burden rested upon the defendants to prove notice to the plaintiff that the paper was not given in the business of the partnership; while in the case of Aymar he held that the plaintiffs were presumed to know that the notes were not given for the benefit of the principal, and that the burden of proving the contrary rested upon them. These two positions are diametrically opposed and cannot be made to harmonize; that taken in Boyd v. Plumb and Gansvoort v. Williams accords with many other cases in this state, and with all the English cases on the subject.
It is true that the decision in the case of The North RiverBank v. Aymar was reversed in the Court of Errors; but the opinions pronounced in that court have never been published, and consequently the views there expressed upon the point in question are unknown. Under these circumstances the principal reason against the reconsideration of a question, which has been passed upon by the court of last resort, viz., that the public needs a fixed and definite rule upon which it can rely in the transaction of business, loses most of its force. The opinion of the Supreme Court, which is published at large in the reports, is more likely to be taken as the rule than that of the Court of Errors, to which attention is rarely directed. The question, therefore, should, I *Page 139 
think, be considered as still open for examination; and I have little hesitation in holding that it was properly decided by the Supreme Court.
It is supposed that the cases of Atwood v. Munnings (7Barn. Cress., 278) and Alexander v. McKenzie (6 Mann.,Gr. S., 766) are in conflict with the doctrine here advanced; but, upon a careful scrutiny of the first of these cases, it will be seen that, if the point we are examining was involved, it received no consideration from the court. The general principle laid down in that case is in perfect accordance with the views here expressed. It is, simply, that where an agent accepts a bill, in a form which imports that he acts by virtue of a special power, any person taking the bill is bound to inquire into and is chargeable with knowledge of the terms of the power. This is not denied. But the question is, whether, after inquiring into the terms of the power, and ascertaining, so far as can be done by comparison, that the act of the agent is within the power, he is chargeable, without proof, with a knowledge of extrinsic facts, which show the act to be unauthorized.
This question, which is the only one which arises here, was not decided, or even adverted to, in Atwood v. Munnings. The report of that case shows that the plaintiffs neglected even to call for the production of the power, to which they were expressly referred by the terms of the acceptance, and for this culpable negligence they are held responsible by the court. Justice BAILEY says: "A person taking such a bill ought to exercise due caution, for he must take it upon the credit of the party who assumes the authority to accept, and it would be only reasonable prudence to require the production of that authority."
It seems to have been taken for granted that, if the plaintiffs had informed themselves as to the terms of the power, they would of course have ascertained the object for which the bill was drawn, and the relation existing between the drawer and the defendant. Indeed, for aught that appears *Page 140 
in the report of the case, it may have been shown upon the trial that they were actually apprized of these facts. The case therefore is no authority, except for the undeniable proposition that one who deals with an agent, knowing that he acts by virtue of a special power, is bound to inquire into and ascertain the precise terms of such power.
The case of Alexander v. McKenzie has even less bearing upon the point. The report of the case, which is very imperfect, does not show the terms of the special power nor the nature of its limitations. All that the case decides is, that the words "per procuration," affixed to an indorsement or acceptance by an agent, import that the agent acts by virtue of a special power, and are sufficient to charge any one who takes the bill with knowledge of the precise terms of such power. The plaintiff in this case, as in that of Atwood v. Munnings (supra), had neglected to call for the production of the power, and no attempt was made to show that the indorsement corresponded with its terms. The plaintiff relied mainly upon the fact that the bank had paid two other bills indorsed in the same manner. The case, taken as a whole, is a somewhat obscure assertion of the same principle which was adopted in Atwood v. Munnings, viz., that one who takes a bill, so indorsed, is bound to require the production of the special power, and to ascertain by comparison that the bill and indorsement correspond in all respects with its terms.
The cases of Grant v. Norway (10 Com. Bench [70 Eng.C.L.R.], 665); Coleman v. Riches (29 Eng. L. and Eq. R.,
323), and The Mechanics' Bank v. The New-York and New HavenRailroad Company (3 Kern., 599), are plainly distinguishable from the present case. In neither of those cases was the document upon which the question arose negotiable. It was sought there to make the principal responsible for a false representation of the agent, not to the person to whom the representation was made, but to one with whom the agent had no dealings, and to whom he had made no representation. *Page 141 
Upon a careful examination, it very plainly, I think, appears that this was the real obstacle to a recovery in each of these cases. When Sergeant CROWDER, counsel for the plaintiffs inGrant v. Norway, cited the case of Hern v. Nichols, and invoked the doctrine there laid down by Lord HOLT, Justice CRESSWELL replied: "There the factor entered into a contract with the plaintiff for his employer. Here you are a step further off. You say your agent, with whom I made no contract, has enabled a man, with whom I did contract, to cheat me."
This remark presents, in my judgment, the turning point of the case, and the only obstacle to the plaintiff's recovery, viz., the want of any privity of contract between the plaintiff and the agent. This obstacle was precisely that which the negotiability of the instrument, if established, would have removed; because the maker of a negotiable instrument is deemed in law to enter into a contract with every one to whom it is afterwards negotiated; and where the instrument is made by an agent it is in this way only that privity of contract can be established between such agent and the subsequent holders, without which the principal can never be held responsible for the false representations of the agent. Hence it is that we find the counsel for the plaintiffs in the cases of Grant v. Norway
and The Mechanics' Bank v. The New-York and New Haven RailroadCompany (supra) contending so strenuously for the negotiability of the documents in question in those cases.
That the want of privity of contract, between the agent and the party seeking to hold the principal responsible, constituted the real difficulty in those cases is also apparent from the report in the case of Coleman v. Riches (supra), which belongs to the same class. There Bond, the agent of Riches, had given a false receipt, not to the plaintiff but to Lewis, and Lewis had exhibited this receipt to the plaintiff and obtained money upon it. The difficulty in the case was to show the relation between the parties to have been such *Page 142 
that the misrepresentation by Bond to the agent might properly be considered as made by him to the plaintiff. To establish this, the counsel for the plaintiff relied upon a course of dealing, which, as he alleged, was known to the defendant. To this the chief justice answered: "I cannot see how the knowledge by Riches of the course of business, according to which Coleman paid on the production of the receipt, would make the showing of the receipt by Lewis, even in Bond's presence, a representation by Riches" (i.e., by the agent of Riches); and Justice WILLIAMS adds: "Suppose Riches himself had given the fraudulent receipt, would that have constituted a representation by Riches to Coleman?" Upon the same argument being afterwards repeated, Justice CRESSWELL said: "There is the vice of the argument; I do not find any evidence of such course of dealing between the plaintiff and the defendant. The course of dealing proved, was that which existed between the plaintiff and the vendors and not between the plaintiff and defendant."
It seems impossible to mistake the purport of these remarks. They show that the difficulty in the way of a recovery, in this case, was that no privity of contract was established between Riches, or his agent, Bond, and the plaintiffs, by means of which the misrepresentations made by Bond could be considered as made to the plaintiffs. Had the receipt been a negotiable instrument, a privity would have been established.
I entertain no doubt that had the stock certificates in question, in the case of The Mechanics' Bank v. The New-Yorkand New Haven Railroad Company (supra), been held to be negotiable, the plaintiffs would have prevailed; and such I understand to be the opinion of two of my associates who took part in the decision of that case.
The judgment of the Supreme Court should be affirmed.
DENIO, C.J., and BROWN, J., delivered opinions concurring in result and general reasoning with the preceding. *Page 143 
Both agreed with SELDEN, J., in approving the decision in TheNorth River Bank v. Aymar (3 Hill, 262), and regarding it as good authority, notwithstanding the reversal of the judgment in that case by the late Court of Errors.