# SUPERIOR COURT OF BUFFALO.

### FRANKLIN LEE and THOMAS LOOMIS° agt. THE PITTSBURGH COAL AND MINING COMPANY.

*Corporation — contract made by president — proof of authority — ratification of — Evidence.*

It is an established rule of law that corporations may enter into and become bound by contracts, express or implied, without other formalities than are requisite in respect to like contracts made by natural persons, and under the same circumstances and conditions. But corporations, of necessity, must act solely through the instrumentality of their officers or other duly authorized agents, and such officers and agents must, like the agents of natural persons, be deemed to be clothed with all the powers and authority necessary or proper to effectuate the purposes of their creation, in the manner, with the means and appliances, and according to the usages customary in the conduct of the business and affairs intrusted to them.

Where a corporation, in the execution of powers conferred by its charter upon its board of directors, had made M. the president and manager of the corporation, he entering into an agreement with plaintiffs by which they were to act as defendant's agents in the sale of coal, for which they were to receive a commission; in an action to recover for such commissions:

*Held*, that what general or special powers were by the board expressly conferred upon M., as such president and manager, can only be determined (in the absence of positive evidence), by inferences from such facts proved as throw light on this point, aided by the presumption that, as the chief executive officer and manager of the company, he must have been clothed with some powers and duties which, of necessity, pertained to those positions.

*Held*, also, that the same evidence upon which prudent business men ordinarily infer the existence of the authority ought to be sufficient and satisfactory to courts and juries.

*Held*, further, that it is not necessary to show authority by express resolution of the board of directors, or by power of attorney or other formal

corporate action; but it is proper, on the question of authority, to prove various acts, statements and declarations, written and verbal, of the president and manager of the corporation, where it appears that they were done and made in the discharge of his duties, in the course of the company's business, and relating directly to current transactions therein.

Where a person is employed for a corporation by one assuming to act in its behalf, and goes on and renders the services according to the agreement, with the knowledge of its officers, and without notice that the contract is not recognized as valid and binding, such corporation will be held to have sanctioned and ratified the contract, and be compelled to pay for the services according to the agreement.

Having availed itself of the services and received the benefits, it is bound in conscience to pay, and will not be allowed to say that the original agreement was not made by a person legally authorized to contract.

*General Term, March,* 1877.

*Before* CLINTON, *C. J., and* SMITH, *J.*

*Samuel S. Rogers,* for appellant.

*M. N. Whitney,* for respondents.

SMITH, *J.* — This is an action to recover for commissions alleged to be due plaintiffs upon the sale of coal for defendant, under an agreement made with the plaintiffs by defendant's president and manager, in October, 1873, by which plaintiffs were to act as defendant's agents at Buffalo for the sale of its coal to Canadian railroads, and to receive a commission of ten cents per ton on all coal sold and delivered.

When the former appeal in this case was before us, we held, and are still of the opinion, for the reasons then given, that the plaintiffs, if entitled to recover for commissions on any part of the coal sold the Grand Trunk Railway company, were entitled to recover for the whole 30,000 tons.

On the trial, a conversation between plaintiff Loomis and defendant's president and manager, and certain letters from the defendant's secretary and treasurer to the plaintiffs, were

received in evidence against the defendant's objection. We think they were properly received. Mullin, the president, in the conversation, and Wilson, the secretary, in writing the letters, were acting in the direct discharge of official duties in respect to the agreement made by Mullin for defendant with the plaintiffs, and the most efficient means to be taken for its performance. The correspondence and conversation were not casual or accidental, but for a definite purpose, in the furtherance of the defendant's business interests, with which both the plaintiffs and Mullin and Wilson were charged. They were a part of the *res gestœ*, as much so as the subsequent negotiations for the sale of coal to the Grand Trunk Company. The letters were also competent as evidence that the defendant had notice that the plaintiffs were employed as its agents, and of the acts of Mullin in that respect. In considering the objection to the evidence, we, of course, assume that the agreement made by Mullin, in behalf of defendant, with the plaintiffs was fully binding on defendant, as made by its authorized agent, or, at least, that the evidence on that subject was properly submitted to the jury, and this brings us to the remaining and most important question in the case.

In this case the defendant, in the execution of powers conferred by its charter upon its board of directors, had made Mr. Mullin the president and manager of the corporation, and Mr. Wilson its secretary and treasurer; they and three others composing its board of directors.

It is now the established rule of law in this country that corporations may enter into and become bound by contracts, express or implied, without other formalities than are requisite in respect to like contracts made by natural persons, and under the same circumstances and conditions. But corporations, of necessity, must act solely through the instrumentality of their officers or other duly authorized agents; and such officers and agents must, like the agents of natural persons, be deemed to be clothed with all the powers and authority necessary or proper to effectuate the purposes of their crea-

tion, in the manner, with the means and appliances, and according to the usages customary in the conduct of the business and affairs intrusted to them.

What general or special powers were by the board expressly conferred upon Mr. Mullin as such president and manager, or what powers inhered in those offices, we can only determine (in the absence of positive evidence) by inferences from such facts proved as throw light on this point, aided by the presumption that, as the chief executive officer and manager of the company, he must have been clothed with some powers and duties which, of necessity, pertained to those positions, as it was shown that the business for which defendant was organized was the mining, shipping and selling of coal, that it had mines in Pennsylvania, and large quantities of coal for sale, which it sought to market in Buffalo and the neighboring province of Canada. We may fairly presume, further, that the defendant's president and manager had, by virtue of his offices, authority to make those contracts in defendant's behalf, which it was necessary that some agent should make for the prosecution of its business, and which the daily exigencies of that business might require. The hiring of operatives to carry on the work of mining coal, the making of contracts for the shipment of coal to the various markets, the employment of agents to receive and take care of coal at those markets, to attend to its sale, and to collect and remit the proceeds, were necessary to the operations of the corporation; and it was also necessary that some agent should be clothed with authority to make such agreements. The public would have the right to assume that the president and manager of the company claiming such authority, and exercising it, did lawfully possess it, and to treat with him accordingly. Upon similar presumptions all business men deal with the executive officers of banking, insurance, railroad, manufacturing and other corporations whose operations move the vast and complicated machinery of trade and commerce. Their boards of directors may, and, no doubt, often do, adopt rules

Lee agt. Pittsburgh Coal and Mining Company.

and regulations defining the powers and duties of the various officers through whose agency the corporate powers and franchises are exercised. But such rules and regulations are usually to be found only upon the minutes of the directors' proceedings, or other private records of the corporation. They are not published, nor do the public, with whom the officers of the corporation transact business, know, or have the means of knowing, what such rules and regulations are. And it often happens — so often as to be the rule rather than the exception — that the chief officers of a corporation exercise a very wide range of powers, virtually grasping the entire direction and control of all its operations, with the tacit consent and approval of the corporation, though it has never by any direct vote or recorded act defined the nature or extent of their authority.

It is, therefore, very difficult, if not impossible, for those having dealings with corporate bodies to determine, except by circumstances and inference, what authority such officers have, or, in case of litigation, to prove their authority by positive evidence. Ought not the same evidence, upon which prudent business men ordinarily infer the existence of the authority, to be satisfactory to courts and juries? And would not the enforcement of more stringent rules embarrass and hinder the operations of trade and commerce, and prove vexatious and injurious to the interests of the corporations themselves?

These considerations lead to the conclusion that, under the circumstances of this case, the plaintiffs had a right to presume that the defendant's president and manager had lawful power to employ them as the agents of his company to sell its coal in this and the Canadian market, and to agree upon a reasonable compensation for their services. The defendant could only effect the sale of its coal through agents employed for that purpose, and those agents must be paid. These were conditions incident to the defendant's business, and necessarily attending its operations. The plaintiffs were engaged in the

coal trade, familiar with its details, had dealt in the defend-
ant's coal, and were located at a point both important as a
market and convenient for defendant's purpose to supply the
Canadian railroads. It was, therefore, natural and legitimate
that the defendant should, in promoting its trade, seek for
their services, and its president and manager was the officer
who, in the ordinary course of affairs, would be expected to
act for it in employing them.

The views we have expressed not only rest upon good reason,
but they are abundantly supported by authority (*The Mer-
chants' Bank* agt. *The State Bank*, 10 *Wallace*, 604, 644;
*The New Hope and Del. Bridge Co.* agt. *Phenix Bank*, 3
*Coms.*, 156; *Am. Ins. Co.* agt. *Oakley*, 9 *Paige*, 496;
*Emmett* agt. *Reed*, 4 *Seld.*, 312; *Mumford* agt. *Hawkins*, 5
*Den.*, 355; *Dates* agt. *Keith Iron Co.*, 607 *Metc.*, 224; *The
Clarke Nat. Bank* agt. *The Bank of Albion*, 52 *Barb.*, 592;
*Farm. and Mech. Bk.* agt. *The Butch. and Drov. Bk.*, 16
*N. Y.*, 125; *S, C.*, 28 *id.*, 425; *Wild* agt. *N. Y. and Austin
Silver M. Co.*, 59 *id.*, 644).

But if there be any doubt as to the correctness of our con-
clusions as to the authority of the defendant's president, yet
there is such ample proof of the ratification of the agree-
ment which he assumed to make in defendant's behalf with
the plaintiffs as to establish their right of recovery beyond
any reasonable doubt. From the correspondence which
occurred between defendant's secretary and the plaintiffs,
immediately after they were employed as defendant's agents,
it is apparent that the defendant had notice of their employ-
ment, such notice having been given to the proper officer, its
secretary and treasurer.

It is most reasonable and natural to infer that Mr. Mullin,
the defendant's president, who employed the plaintiffs, him-
self gave the notice. In addition to other evidence that the
defendant was not slow to recognize their employment and to
avail itself of their services, it was proved that not long after
the making of the agreement by defendant's president, by

which plaintiffs were to act as defendant's agents, the defendant made a contract with the Grand Trunk Railway Company of Canada, to furnish and deliver to it 30,000 tons of coal, the contract being made on defendant's behalf by Mr. Mullin, its president and manager, and Mr. Wilson, its secretary and treasurer, the same officers who had acted for defendant in its dealings with the plaintiffs.

And the negotiations for the contract with the railway company being conducted at Montreal, one of the plaintiffs accompanied those officers of the defendant, at their request, to that city to assist them, and did materially assist them in negotiating and securing that contract for the defendant. And it must be borne in mind that one principal purpose of the plaintiffs' employment, indeed, the main one, was to secure their aid to the defendant in obtaining such contracts with the Canadian railways, their commissions being measured by the amount of coal sold. It was also proved that, at the foot of the defendant's contract with the Grand Trunk Railway Company, a note or memorandum was entered referring to the plaintiffs as the defendant's agents at Buffalo, and that, in preparing the written proposition which formed the basis of that contract, and the estimate of the expenses to be incurred in performing it, the defendant set down as one item of those expenses the commission to be paid to the plaintiffs under the agreement made with them by defendant's president. That contract with the Grand Trunk company the defendant performed, delivering under it 30,000 tons of coal, receiving therefor four dollars and eighty-five cents per ton, and, as a part thereof, the very item of ten cents per ton for plaintiffs' commissions, for which this action was brought.

I cannot better express the legal effect of those acts of the defendant than in the words of justice JOHNSON of the supreme court, in *Fister* agt. *La Rue* (15 *Barb.*, 323): "It is well settled, at least in this country, that where a person is employed for a corporation by one assuming to act in its behalf, and goes on and renders the services according to the

agreement, with the knowledge of its officers, and without notice that the contract is not recognized as valid and binding, such corporation will be held to have sanctioned and ratified the contract, and be compelled to pay for the services according to the agreement. Having availed itself of the services and received the benefits, it is bound in conscience to pay, and will not be heard to say that the original agreement was not made by a person legally authorized to contract."

The case of *Sturgis, administrator*, agt. *The New Jersey Steamboat Company* (62 *N. Y.*, 625) is so nearly identical with this as to be an authority directly in point. That action was for commissions alleged to have been agreed upon for the services of Russell Sturgis, as a broker, in chartering two steamers, owned by defendant, to the United States government. It appeared that Daniel Drew, defendant's president, agreed with Sturgis that, if he would effect a charter for the steamers, he should receive five per cent on the earnings; that Sturgis saw the government agent and took him to Drew, and charter-parties were executed, hiring both vessels at $800 per day for one month, and longer if required; that the vessels, under this charter, remained some months in the service of the government, and the defendant received the charter-money. On these facts, the defendant claimed that Drew had no authority as president to make the agreement with Sturgis, but the court of appeals held that the defendant, by accepting the charter-parties and the moneys under them, not only ratified the acts of Drew in entering into them, but that those acts furnished a presumption that he was authorized to enter into them, and also to use the customary reasonable means for procuring charters for vessels, one of which was the employment of brokers (*See, also, Reuter* agt. *Electric Tel. Co.*, 6 *Ellis & B.*, 341 [88 *E. C. L.*, 341]).

In this case it is conceded that the contract between the defendant and the Grand Trunk railway was duly and regularly made, and the presumption follows that defendant's

Lee agt. Pittsburgh Coal and Mining Company.

officers, who made it, were authorized to employ the plaintiffs to assist them to obtain that contract, and to pay them a commission for their services.

The judgment is affirmed, with costs.

NOTE. — Affirmed by court of appeals, November, 1878. No opinion written. [ED.