review from the record before it cannot satisfactorily perform its duties.

It follows from these considerations that the three orders should be annulled and the matter remitted to the commission for further action, without costs.

---

## LORD v. UNITED STATES TRANSP. CO.

(Supreme Court, Appellate Division, First Department.    March 17, 1911.)

1. CORPORATIONS (§ 409*)—AGENTS—GENERAL MANAGER—AUTHORITY—LEASES.
    A corporation designating a general manager to transact its ordinary business cannot be deemed to thus hold such manager out to the public as authorized to dispose of its property required for the performance of its corporate functions and terminate its business, and hence the general manager of a transportation company not incorporated for the business of subleasing piers had no authority to sublease a pier used by the company.
    [Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1620–1622; Dec. Dig. § 409.*]

2. CORPORATIONS (§ 432*)—AGENTS—GENERAL MANAGER—AUTHORITY—SUFFICIENCY OF EVIDENCE.
    Evidence *held* insufficient to show that a transportation corporation clothed its general manager with apparent authority to sublease a dock used by the corporation.
    [Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1717–1737; Dec. Dig. § 432.*]

3. CORPORATIONS (§ 426*)—AGENTS—UNAUTHORIZED ACTS—RATIFICATION.
    Where the president of defendant corporation had no knowledge that its general manager had without authority employed plaintiff, a broker, to sublease a dock, it could not be held to have ratified the contract by thereafter dealing with a customer procured by plaintiff.
    [Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1596, 1702–1716; Dec. Dig. § 426.*]

4. BROKERS (§ 8*)—EMPLOYMENT—SUFFICIENCY OF EVIDENCE.
    Evidence *held* insufficient to show that plaintiff, a broker, was employed by defendant's general manager to sublease a dock.
    [Ed. Note.—For other cases, see Brokers, Cent. Dig. § 9; Dec. Dig. § 8.*]

5. BROKERS (§ 86*)—COMMISSIONS.
    In a broker's action for commissions in subleasing a dock for defendant, evidence *held* to show that the sublease made by defendant was so materially different from that which plaintiff claimed he was authorized to make that he was not entitled to recover.
    [Ed. Note.—For other cases, see Brokers, Dec. Dig. § 86.*]

6. BROKERS (§ 53*)—COMMISSIONS—CAUSE OF CONTRACT.
    The services of a broker must be the direct and proximate cause, and not the indirect, accidental, or remote cause, of bringing a customer to his principal.
    [Ed. Note.—For other cases, see Brokers, Cent. Dig. § 74; Dec. Dig. § 53.*]

7. BROKERS (§ 53*)—COMMISSIONS.
    Where a broker advertises property, and a customer is procured thereby, that is the direct result of the broker's efforts.
    [Ed. Note.—For other cases, see Brokers, Cent. Dig. § 74; Dec. Dig. § 53.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

8. BROKERS (§ 57*)—COMMISSIONS—PRO RATA COMMISSION.

Where a broker procures a prospective customer, and the principal takes up the negotiations which result in a contract, even though the terms as to consideration are changed, the broker may recover his commission pro rata.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 66–72; Dec. Dig. § 57.*]

9. BROKERS (§ 9*)—AUTHORITY—TERMINATION.

Where a prospective lessee did not accept an offer made by plaintiff, a broker, of part of defendant's dock, and plaintiff had no authority to offer the entire dock, defendant was justified in regarding the authority given plaintiff as ended.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 10; Dec. Dig. § 9.*]

10. BROKERS (§ 56*)—COMMISSIONS—NEGOTIATIONS BETWEEN CUSTOMER AND PRINCIPAL.

A broker, who, by attracting attention to property, interests a party who refuses to negotiate through him, is not entitled to a commission, if the principal in good faith thereafter negotiates a contract on the direct application of such party.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 85–89; Dec. Dig. § 56.*]

11. BROKERS (§ 56*)—COMMISSIONS—NEGOTIATIONS BETWEEN CUSTOMER AND PRINCIPAL.

A broker, who brings his principal and a customer together, is entitled to a commission, if the negotiations are then taken out of his hands and conducted by the principal, resulting in a contract.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 85–89; Dec. Dig. § 56.*]

12. BROKERS (§ 86*)—COMMISSIONS—SUFFICIENCY OF EVIDENCE.

Evidence *held* insufficient to show that plaintiff, a broker, was the procuring cause of a lease for the making of which he claimed commissions.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 116–120; Dec. Dig. § 86.*]

Appeal from Trial Term, New York County.

Action by George O. Lord against the United States Transportation Company. From a judgment for plaintiff and from an order denying a new trial, defendant appeals. Reversed, and new trial granted.

Argued before INGRAHAM, P. J., and LAUGHLIN, McLAUGHLIN, SCOTT, and MILLER, JJ.

Joseph W. Welsh, for appellant.
James R. Deering, for respondent.

LAUGHLIN, J. The plaintiff is a real estate broker, and he brought this action to recover commissions for subleasing for the defendant Pier No. 84 and bulkhead, North River, situate at the foot of West Forty-Fourth street, borough of Manhattan, New York. He claims to have been employed as a broker for this purpose on the 21st day of November, 1907, by one Robert C. Scholz, an employé of the defendant whose position was designated "general manager." Scholz was neither a director nor an officer of the company, and the position of general manager was created by its president, and the duties were prescribed by him and were confined to the passenger and

freight transportation business of the defendant. The case may be better understood by stating briefly at the outset the contentions of the appellant. They are that Scholz had no authority to sublease the pier or to employ plaintiff as a broker; that he did not assume to do either; that the plaintiff was not the procuring cause of the subleases of the pier which were subsequently made by the defendant and were of materially different property and on materially different terms from those with respect to which, on his own theory, he was employed in the matter; and that the verdict is against the weight of the evidence on these points.

The defendant is a foreign corporation. It was duly incorporated under the laws of Connecticut on the 4th day of October, 1906, and it was authorized, among other things, to acquire and operate, "either singly for trading purposes, or as lines," vessels operated by any power between parts in the United States and any other part of the world, and "to construct, acquire, lease and own all such docks, wharves, piers or other terminal facilities as shall be necessary in the maintenance and operation of such vessels or line or lines." Its certificate of incorporation required that its principal office be located in Connecticut, and its by-laws provided that its general offices should be located there. Shortly after its incorporation, it established general offices at No. 742 East Twelfth street, borough of Manhattan, New York, and there the business of the president, secretary, and treasurer, and the financial business of the company, was transacted. It also had an office at No. 40 Wall street, where monthly meetings of the directors were held. , It used, occupied, and had an office on Pier 28, East River. It owned and operated four coast lines of steamers from New York. Its by-laws provided that the president should have "the general supervision and direction of the affairs of the company, subject to the instructions and advice of" the board of directors; that the "officers and agents of the company shall perform such duties as may from time to time be assigned to them respectively by the board of directors or the president"; and that "no conveyance of real estate belonging to the company shall be made without the authority of the board of directors."

On the 28th day of March, 1907, defendant obtained a lease of Pier 84 and bulkhead, North River, from the city by its commissioner of docks. By this lease the city agreed to erect sheds on the pier and bulkhead. The lease was for a term of ten years and was to commence when the sheds were completed. It does not appear definitely when the defendant took possession under this lease; but it was shown that the city did not erect the sheds, and that the defendant erected temporary sheds, 60x160 or 170 feet in dimensions, near the bulkhead line, and occupied the pier during the summer season of 1907 in connection with the transportation of passengers and freight by one of its lines known as the "Neptune Line," and had an office on the pier. Scholz, as general manager, had an office on this pier and also on Pier 28, East River. On the 2d day of January, 1908, after certain negotiations, which will be considered presently, the defendant made an agreement in writing with the Compagnie Gen-

erale Transatlantique, known as the "French Line," to sublet to the latter company a "portion" of Pier 84 for a rental of $31,500 per annum from February 1st, thereafter for the balance of the original term for which the defendant held the pier under its lease from the city. It was recited in this agreement that the portion of the pier thus sublet had been agreed upon verbally by the parties that day. The pier was 700 feet in length by 100 feet in width. The bulkhead extended from the northerly line of the pier southerly 220 feet, leaving 120 feet of bulkhead opposite the slip southerly of the pier.

The defendant then, evidently according to an understanding which it had with French Line, negotiated with the city for a modification of its lease, or for a new lease to be substituted therefor, and on the 12th day of March, 1908, it obtained from the city a lease of the pier and bulkhead for a period of 10 years from March 1, 1908, with the privilege of one renewal. This lease omitted provisions contained in the first lease, with respect to the erection of sheds by the city and the payment of an additional rental thereafter of 5 per cent. on the estimated cost thereof, which was $200,000, and substituted therefor provisions authorizing and requiring the erection of temporary sheds by the defendant to continue until the end of the original term, and then to become the property of the city. On the same day the defendant and the French Line made a preliminary memorandum agreement for subleasing the entire pier and bulkhead at $36,500 per annum for 10 years from the 1st day of March, 1908, subject to the terms and provisions of the defendant's lease. The defendant in the meantime evidently had determined that it would have but little use for the pier, and it was willing, if it could obtain authority from the city therefor, to sublet the entire pier and bulkhead to the French Line with some understanding or agreement with respect to the limited use which it desired to make thereof; but the lease could neither be assigned nor any part of the pier or bulkhead sublet without the written consent of the commissioner of docks, and he refused to consent without consulting the mayor, and, owing to the delay incident to an application for leave to sublet the remaining part of the pier, it was determined to execute a formal lease of the entire bulkhead and three-fourths of the pier, according to the original agreement of January 6th, with the exception that in the meantime it had been agreed that the part of the pier to be reserved by the defendant should be the outer end of the northerly side of the pier, instead of the inner end, and that it should be only 252 feet instead of one-half the length of the pier, and excepting also that the expiration of the term was definitely fixed to correspond with the substituted lease made between the defendant and the city.

Accordingly, on the 28th day of May, 1908, a formal lease of the bulkhead and pier, with this exception, was made by the defendant to the French Line, for the period of nine years and nine months from the 1st day of June, 1908, at the annual rental of $31,500; the lessee agreeing to perform the lessor's duty to the city to erect the temporary sheds, and on the same day a formal license in writing was given by the defendant to the French Line to use the remaining part of the pier

when the same was not in use by the defendant. The license was to commence on the 1st day of June, 1908, and to terminate with the lease, March 1, 1918, and the defendant was to receive therefor $5,-000 per annum. The consent of the commissioner of docks to the defendant subleasing the rest of the pier having finally been obtained, the license was formally canceled on the 21st day of June thereafter by mutual consent, to take effect on March 1, 1909, and at the same time a formal agreement was executed by the parties, by which the French Line subleased the remainder of the pier for the balance of the period for $5,000 per annum. At the time the first agreement for part of the pier was made on the 6th of January, there was no agreement or understanding with respect to subleasing the remainder of the pier; but it was understood that the French Line was to have the use of it in the winter, when the defendant would not need it. All of the negotiations with respect to these various agreements were had between the defendant and the French Line, and the plaintiff took no part therein.

The plaintiff made a specialty of leasing water front property in or about the Harbor of New York. In 1905 he had had some negotiations with the French Line with a view to having it lease this pier, or a pier at the foot of West Forty-Second street; but, on account of the anchorage of war vessels opposite those points, the pier was not satisfactory to said line.

In the fall of 1907, he knew that the defendant had a lease of this pier; but he was not aware that it desired to sublet the pier or any part of it, or that the French Line wanted a pier; but he says that he saw an article in a paper with respect to the defendant's discontinuing its line at this pier, and, thinking that the pier might be for rent, he addressed a letter to the defendant at the foot of West Forty-Fourth street on the 19th day of November, 1907, as follows:

"Will you please advise me if you will sublease any part of pier at the foot of West 44th St., N. R., and for what period. I inclose circular showing the piers I have leased. Awaiting your reply, I am."

At this time he knew of no demand for this or a like pier, and says that the pier was suitable to the purposes of only two lines doing business in the Harbor of New York, one of which was the French Line and the other the Panama Line, and that he did not know that either of them would be interested; but the objection made by the French Line in 1905 had been obviated by a change of anchorage grounds. This letter was received and opened by Scholz, who answered it on a letter head indicating that he was the general manager of the defendant, and that it was written from the general offices of the company and Pier 28, East River, and he signed it as general manager. He merely acknowledged the receipt of the plaintiff's letter and said:

"Glad to have you call in reference to the matter in question, and will be pleased to discuss same with you."

Plaintiff testified: That he called on Scholz on the 21st day of November, 1907, and was informed that the company would sublet its lease for the balance of the original term. That he informed Scholz

that he had "one or two parties who might be interested in the subleasing of the pier," to which Scholz replied:

"We have been talking to one or two parties about the subleasing, but nothing has been done. I don't suppose you are working for your health, Mr. Lord. In case we should lease the pier to any one of your parties, what would your commission be?"

That the witness replied:

"My commission is 5 per cent. on the total amount of rental."

And Scholz answered:

"That is all right."

That he then said:

"I think I can let the pier if you want to lease it."

And Scholz replied:

"Yes. Now I tell you, Mr. Lord, as man to man, you tell me who your parties are, I will tell you if they are the people we have been dealing with."

That the witness answered:

"Mr. Scholz, that seems square. Either the French Line or the Panama Steamship Company would be interested in a sublease of this pier."

That Scholz then said:

"You go and see them and see what they have to say."

That he then called on Mr. Cauchois, assistant general agent at New York of the French Line, the same day, who said that his line would like the pier, and asked if it could be obtained for $100,000 bonus, to which he replied that he would try and see if it could be obtained for that, and Cauchois requested him to act promptly, saying that the French Line had an option on the South Brooklyn Pier, where its cargo boats were then loaded, which had to be exercised by the 1st of December or it would be compelled to continue its lease of that pier for six months longer. That he then called to see Scholz, and, not finding him in, on the same day addressed a letter to the defendant at Pier 28, East River, stating that he had presented the matter to the representative of the French Line, who wished him to ascertain "from you the lowest amount (bonus) you would accept for the lease," and requesting an early answer on account of the necessity of the French Line acting on the option which it had on the Brooklyn Pier. That he received no reply to this letter, and called on Scholz on the 25th day of the same month and reported his interview with Cauchois and was informed by Scholz that:

"He had taken the matter to his directors and he would let me know in a very few days, and he would reply to me in a very few days."

That on November 27th he received a letter from Scholz under date of the 26th, as follows:

"In reply to yours of the 21st inst., contents of which I have carefully noted, would say that we have decided not to lease the entire pier, but we are willing to sublease the northern half thereof."

That he then called on Cauchois and showed him this letter, who on reading it said:

"Oh, that won't do. We want the whole pier; a half won't do."

That he then called on Scholz and informed him of what Cauchois said. That Scholz then made a diagram showing what part of the pier the defendant could spare and would rent, and on the diagram he reserved the southeasterly inner one-fourth of the pier and made no reference to the bulkhead, and showed by dimensions a balance of 52,-500 square feet, or three-fourths of the pier that defendant would rent, and that after some figuring Scholz said that the defendant would rent it for 70 cents per square foot, making a total rental of $36,750 per annum. That he called on Cauchois again the same day and was introduced to Faguet, the general agent of the French Line, to whom he presented the diagram made by Scholz and the proposition for subleasing three-fourths of the pier. That Faguet said that he would like the whole pier if he could get it, but would consider three-fourths of it, and would take it up with his superintendent and let him know in a few days, and he then reported this to Scholz. That he saw Faguet a week or ten days later and asked if there was anything new with regard to leasing the pier, and the reply was, "We are still considering, Mr. Lord," but added that his line would like to get the whole pier. That early in December he saw Scholz again and informed him that the French Line was still considering the matter, but wanted the whole pier if it could get it, and that Scholz replied that this was the best that the defendant would do. That he saw Faguet again and talked with Scholz over the telephone and personally two or three times before December 21st, and that Faguet's attitude remained the same, and that Scholz said that three-fourths of the pier was all that the company would lease. That on December 21st he wrote Scholz as follows:

"Will you please advise me if you are now ready to take up the question of subleasing the pier at the foot of West 44th St."

And that he received no reply. That he telephoned and called to see Scholz several times, but never reached him. That the latter part of January, 1908, he heard of the other negotiations between the defendant and the French Line, and endeavored to see Scholz, and finally saw him on the 12th of February and asked about the basis of the agreement, stating that he desired to know to enable him to put in his bill for commissions, and that Scholz took the position that he was not entitled to any commissions and refused to give him any information.

This is the only authority the plaintiff claims to have received, and this is the only part, according to his own testimony, that he took in the matter. On the trial the complaint was amended so as to allege the two separate agreements made by the defendant, the one for subleasing the bulkhead and part of the pier at a rental of $31,500 per annum, and the other for renting the rest of the pier at a rental of $5,000 per annum, and commissions at the rate of 5 per centum on the total amount of rent reserved in each agreement from the respective dates thereof was demanded, and a recovery in full was had on that

theory.  On the 1st day of May, 1908, the plaintiff presented a bill to the defendant for commissions on the theory that the bulkhead and pier had been sublet for $36,500 per annum, and he testified in substance that he then understood that only three-quarters of the pier had been sublet, and that this was on the basis of 70 cents per square foot and in accordance with the proposition which he was authorized to and did present to the French Line.  This was rejected, and the defendant disavowed liability.  On the trial plaintiff attempted to sustain this theory by his testimony to the effect that when he was employed the city was obligated to shed the pier, and that he was informed by some official of the French Line that a deduction of $5,000 in rental was allowed on account of the change by which the French Line was to erect the sheds; but he does not identify the official who gave him this information, and the testimony of every witness who took part in the subsequent negotiations is to the effect that the rental was negotiated without reference to any proposition submitted by the plaintiff or any deduction on account of shedding the piers.  Plaintiff, through his attorney, presented another bill on the 3d day of July, 1908, for commissions on a basis of an annual rental of $36,500; but the defendant thereafter received a letter, bearing date four days later, correcting this bill and stating that it should have been figured on $31,500 per annum, and that "the error arose from my taking the amount of a bill rendered at the time of the agreement to lease the entire pier."

It is suggested that the fact that the entire pier was sublet was not then a matter of record and had not been discovered.  Assuming that the plaintiff was at the outset employed to obtain a tenant for the entire pier and bulkhead, yet, before a rental was agreed upon or a tenant was procured, the defendant determined and notified him that it would only lease one-half or at most three-quarters of the pier.  This modified any authority with which the plaintiff had been vested, and, inasmuch as he never received any further authority, he was in no event entitled to recover on the theory that he obtained a tenant for the entire pier and bulkhead.  No exception, however, was taken to the charge in so far as it permitted the plaintiff to recover for obtaining subleases on the entire bulkhead and pier as manifested by the two agreements, and it is doubtful, therefore, whether any question with respect to the amount of the verdict is properly presented by the appeal, although it would seem that the motion for a new trial may be deemed to have raised it.

Scholz testified, in substance: That he had been informed by the president of the defendant of his intention to sublet part of the pier.  That he had no authority either to employ a broker or to sublet the pier, but that, inasmuch as it concerned his company, he wrote the letter inviting the plaintiff to call.  That he said to the plaintiff at the outset that his company would not sublet the whole pier, but was considering subletting half of it, and that he had no authority in the premises, but would have to submit any question relating to it to the president, and that nothing was said about commissions.  That he indicated on a diagram the part of the pier which he thought his company would wish to

reserve, and made figures indicating what he thought would be a fair rental, but refused to specify a price on the ground of want of authority. That at the second interview the plaintiff merely asked if the defendant would consider a bonus of $100,000 for the entire pier, and he agreed to take it up with the president and let plaintiff know later, and that he telephoned the president the substance of the inquiry, but did not state who called on him in the premises or in whose behalf the inquiry was made. That he then wrote the second letter stating that the company would only lease half of the pier.

Mr. Taylor, the president of the defendant, who ceased to be president in May, 1908, and was apparently disinterested, testified, in substance, that he personally negotiated the subleases; that he did not know the plaintiff and never heard of him in connection with the matter until after he had met and discussed the question with Mr. Cauchois of the French Line on the 25th day of November, 1907; that in August or early in September of that year he concluded that his company would not require the entire pier, and asked Bensel, the commissioner of docks, if it would be permitted to sublet part of the pier to a railroad, and that Bensel informed him there were objections to railroads getting so many piers, but said, "I can possibly get a steamship company to take part of that pier"; that he saw Bensel again early in October and asked if he knew of a steamship company to which it could rent part of the pier, and saw him on another occasion in October, and again by or before the middle of November thereafter, and on the 20th of November, he thought, but it might have been the 21st, Bensel arranged for a meeting between him and the French Line people at the Midday Club on the 25th of November with a view to subleasing part of the pier; that Bensel either at the time he arranged the meeting, or at the meeting, asked him who Mr. Lord, who was offering the pier, was; that this was the first time he had heard of Lord, and, thinking that it was a mistake, he did not inquire further about it, but answered that no one knew about or had anything to do with subleasing the pier but himself; that at the meeting on the 25th an appointment was made by him to meet Mr. Cauchois and Mr. Faguet on the pier on the 29th of the month, and after the meeting he telephoned Scholz to be present on the 29th, and said that he understood that Mr. Lord was offering the pier, and that he was taking care of this business himself through Bensel, and asked who Lord was, and was informed by Scholz that he was a broker who was interested in the pier, and that he made no further inquiry and heard nothing more with respect to Lord's connection with it; that in October or November he informed Scholz of his intention to sublease part of the pier, but never requested or authorized him to hire a broker or to obtain a tenant; that he met Faguet and Cauchois and Scholz on November 29th, and they looked the pier over and discussed the situation at length, and that while they did not come to any definite agreement, the wishes of each party were made known to the other, and he authorized Scholz to continue the negotiations which resulted in the memorandum agreement of January 6, 1908; and that the subsequent agreements were negotiated by him personally.

Scholz further testified that he did not know until November 29th that President Taylor was negotiating with the French Line, and that he then informed Taylor that Lord had mentioned the French Line to him in connection with Pier 84, and Taylor said that Lord would not be interested, as he had been dealing with Bensel for some time, but that he did not even then give Taylor the details of his interviews with the plaintiff or inform him with respect to the letters he had written, and that on the 27th, when Taylor telephoned him with respect to the meeting on the 29th, Taylor spoke of a man named Lord having a letter from him authorizing the subletting of the whole of the pier, and asked if he had written such a letter, and he replied that he had not.

Bensel testified that he was only interested in obtaining leases for the city; that he arranged the meeting between the president of the defendant and the representatives of the French Line, and he thinks it was at the request of the former; that he knew the latter part of the summer or fore part of the fall, from information derived from Faguet and Cauchois, that the French Line wanted another pier, and that defendant wanted to sublet part of this pier, for its president had so informed him, and later he understood that the French Line had determined that it desired this particular pier, and that he thinks he informed Cauchois or Faguet that Taylor, defendant's president, had stated to him that his company would sublet part of this pier, but he could not fix the date of this more definitely than that "probably it was some time in October or November"; that on one occasion Cauchois asked him if the plaintiff had this pier, and he replied that no one had it, that it was not necessary to see any one but the city's representatives; but that he could not fix the date of this conversation.

It is to be inferred from his testimony that he considered that a broker could not be employed in such a case, as there was no right to sublet the pier without the consent of the commissioner of docks. He evidently knew that defendant desired to sublease part of the pier, and that the French Line wanted a pier and would like this one; but he says that he did not bring them together until one of them requested it. Cauchois testified that the plaintiff had no proposition when he first came to him, but intimated that he thought the French Line could get a portion of this pier; that he took the matter up with the president and secretary and treasurer of defendant at the meeting on the 25th of November, which it is to be inferred from his testimony was arranged, but not at his request, by Bensel after he called on. Bensel shortly after plaintiff's first interview with him and on the same day, for he testified: "I thought if I got next to the principal I could get it all," meaning the entire pier. That he informed Bensel that the plaintiff was offering the pier and asked how that came about, and that Bensel replied that he did not know anything about Lord, but to let Lord alone, and if the wharf could be got the French Line would get it, and that Bensel then arranged the meeting. That on the 25th Taylor, the president of the defendant, offered to lease to the French Line three-quarters of the pier. That this was before the plaintiff submitted any proposition, but that he did not inform the

plaintiff about this when the plaintiff called on the 27th. That negotiations were resumed with Taylor on the 29th and continued by direction of Taylor with Scholz and resulted in the memorandum agreement of January 6, 1908. That his company would not entertain the proposition to take three-quarters of the pier with the reservation of half of the southerly half by the defendant, which was the only proposition submitted by the plaintiff. That early in the autumn of 1907 the French Line established another line to New York and determined to get a pier on the North River, and Faguet then took the matter up with Bensel, and had several interviews, and then turned it over to him on his return from Europe the latter part of October or fore part of November, which was the time he first learned that Pier 84 might be obtained by his line. That Faguet then directed him to endeavor to get Pier 84 if possible, as the only practical pier for the company's purposes, and he so informed Bensel. That he had spoken to Bensel about this pier prior to the time the plaintiff first called on him and had seen him a number of times with respect to it and other piers, but particularly about Pier 84, endeavoring to secure a pier on the North River through the dock department, and turned the matter over to him. That Bensel said it had been leased to defendant, but he would see what could be done, and that at the second interview he informed the witness that there was a possibility that Pier 84 might be obtained, and that at the next interview he said he thought it could be obtained. That he saw Bensel twice at least before the plaintiff called. That the plaintiff brought him the first definite information to the effect that the defendant desired to sublet any part of the pier.

Fauget testified that plaintiff was introduced to him at the office by Cauchois on November 27th and submitted a proposition for one-half of the pier, which he rejected, and that he received no other proposition from him; that he met Taylor and Scholz with Cauchois on November 29th, and his testimony accords with that of Cauchois with respect to what occurred at that time and with respect to his prior negotiations with Bensel and the determination to get Pier 84 if possible and his instructions to Cauchois.

The evidence has been examined and considered in the light of the arguments of counsel, and an outline of the salient points deemed most material has been given; but we have not attempted to digest or state it all. The points presented by the appellant will now be considered separately.

First. I am of opinion that Scholz had no authority from the defendant to make the contract which the plaintiff testifies was made by him. It cannot be successfully contended that he had actual authority. The only real question is whether the defendant clothed him with apparent authority. The plaintiff had had no previous dealings with the defendant. The defendant designated Scholz its general manager and apparently authorized him to use stationery with this designation of his position. The plaintiff would have a right to assume that he was connected with the general offices of the company and that he was authorized to open its mail; but the plaintiff was chargeable with notice and knowledge of the purposes of the defendant's incorporation and of the business conducted by it and transacted for it by Scholz.

Alexander et al. v. Cauldwell, 83 N. Y. 480. With that knowledge he would have the right to assume that any contract with respect to the transportation business of the company was within the authority of Scholz, and the defendant would be bound thereby (Rathbun v. Snow, 123 N. Y. 343, 25 N. E. 379, 10 L. R. A. 355; Sistare v. Best, 88 N. Y. 527; Norton v. Genesee Nat. Savings Ass'n, 57 App. Div. 520, 68 N. Y. Supp. 32); but the business for which the defendant was incorporated was not subleasing piers. It cannot be that a corporation, on designating a general manager to transact its ordinary business, can be deemed to thus hold the general manager out to the public as authorized to dispose of its property required for the performance of its corporate functions and terminate its business. The plaintiff found Scholz in charge of the pier as general manager of the defendant, and he knew that the defendant had just entered upon a long term lease of the pier. As well might it be said that Scholz was clothed with apparent authority to sell its steamboat lines or to sell its real property interests acquired for its use. Could an action for the specific performance of such contracts, if made by Scholz, be maintained against the company, or would it be liable for a breach thereof?' The fact that the defendant desired to sublease does not affect the question at all. Plaintiff was not on these facts, I think, justified in assuming that Scholz was authorized to sublease the pier; nor do I think that the defendant held Scholz out as vested with such authority. Camacho v. Hamilton Bank Note Co., 2 App. Div. 369, 37 N. Y. Supp. 725; Leonardi v. Times, etc., Co., 127 App. Div. 193, 111 N. Y. Supp. 523; Norman v. Loomis-Manning Filter Co., 123 App. Div. 739, 740, 108 N. Y. Supp. 261; Norton v. Genesee Nat. Savings Ass'n, 57 App. Div. 520, 68 N. Y. Supp. 32; Brewster v. Wilson, 30 App. Div. 494, 52 N. Y. Supp. 272. See, also, Benedict v. Pell, 70 App. Div. 40–45, 74 N. Y. Supp. 1085; Cohn Co. v. Lee, 132 App. Div. 697, 117 N. Y. Supp. 550; Alexander et al. v. Caldwell, 83 N. Y. 480; Jaques v. Todd, 3 Wend. 91.

The question is not with respect to the authority Scholz assumed to exercise, but with what appearance of authority did the defendant clothe him? Hay v. Platt, 66 Hun, 488, 491, 21 N. Y. Supp. 362; Edwards v. Dooley, 120 N. Y. 540, 24 N. E. 827. With respect to the contention that Scholz probably conferred with Taylor and was by him specially authorized to negotiate with plaintiff, and was thus given authority to make the contract, I think plaintiff is not in a position so to contend, for the only contract he claims Scholz made was at the first interview, and, according to his testimony, there was no break in that interview to admit of a communication with Taylor. Moreover, according to the testimony of both Taylor and Scholz, the former was in touch with the representatives of the French Line before he heard of plaintiff in the matter, and that was several days after plaintiff's first interview with Scholz. Of course, if the defendant, with knowledge that Scholz made a contract as claimed, accepted a customer produced by him and made the contract on a proposition which he was authorized to submit, it would be bound by the contract on the theory of ratification. Lee v. Pittsburg Coal & Mining Co., 56 How. Prac. 373, affirmed 75 N. Y. 601; Smith v. Car Heater Co., 19 N. Y. Supp.

285.[1] But Scholz not having been authorized to employ the plaintiff, the defendant is not chargeable with any knowledge possessed by Scholz and not communicated to Taylor (Benedict v. Pell, supra), and as Taylor had no actual knowledge, the defendant cannot be held on the theory of ratification for having accepted the fruits of plaintiff's services and not having discharged him from any contract· of employment attempted to have been made by Scholz (Bright v. Canadian Int. Stk. Yd. Co., 83 Hun, 482, 32 N. Y. Supp. 71; Norden v. Duke, 120 App. Div. 1, 104 N. Y. Supp. 854; Trustees, &c., v. Bowman, 136 N. Y. 521, 32 N. E. 987).

Second. I am also of opinion that the plaintiff failed to bear the burden of showing by a preponderance of evidence that he was employed by Scholz, as he claims. His testimony in that regard is flatly contradicted by that of Scholz, who, so far as appears, would have no object in concealing the fact from the president of the company if he made the contract and was authorized to make it, and it is not probable that he would have attempted to make the contract without authority and conceal the fact and run the risk of personal liability. Moreover, it is not probable that he would have volunteered to make an agreement with respect to commissions before a basis, especially with respect to rental, for subleasing the pier had been agreed upon. He does not claim that he was given any figures with respect to rental at the first interview, and at the second he was distinctly informed, according to his own testimony, that Scholz had submitted the matter to the directors of the company and was awaiting authority from them. Furthermore, it was fairly to be inferred from the plaintiff's letter that he already had a client who was interested in the pier, and that he was not seeking employment by the defendant as a broker, and evidently that· is what Scholz supposed. It is not likely that Scholz, who owed his position and employment to the president of the company, from whom he received his only authority, informed plaintiff that he had submitted the matter to the directors of the company. The fact that the plaintiff went to the French Line without any proposition and without any information that that company desired the pier, or any pier, indicates that the first interview was merely preliminary, anl I think Scholz's version is the more probable. Doubtless a question of fact was presented as to whether or not Scholz informed Taylor of his negotiations with plaintiff and as to whether he may not have been acting by authority of Taylor after plaintiff's first call; but it cannot be said to be sustained by a preponderance of evidence when it rests on inference· and conjecture and is opposed by the express testimony of both Taylor and Scholz. The reasonable inference is that Scholz obtained and communicated certain information to plaintiff on the theory that plaintiff was representing another, but did not assume to employ him as a broker or deem it important to inform Taylor who was inquiring about the pier.

Third. I am also of opinion that the plaintiff was not entitled to recover because the defendant did not as the result of the first negotia-

[1] Reported in full in the New York Supplement; reported as a memorandum decision without opinion in 64 Hun, 639.

tions sublease the property which the plaintiff, on his own testimony, was authorized to sublet, or on a contract at all similar to the one he claims to have been authorized to negotiate. If at the original interview he was authorized to sublet the entire pier, this authority was modified before he or defendant procured a tenant, and he was limited first to sublet one-half of the pier and finally to sublet three-quarters of the pier, aggregating 52,500 square feet, at an annual rental of $36,750 for the balance of the defendant's original term under its then existing lease with the city, and the defendant first reserved to itself the southerly half of the pier and finally the inner half of that, and the entire bulkhead south of the pier. This was the only complete proposition in any view of the evidence which the plaintiff was authorized at any time to submit to the French Line, and it was finally rejected, for it clearly appears, and the contrary is not even contended, that the French Line would not take a sublease with a reservation to the defendant of any of the southerly part of the pier. That proposition, if authorized at all, must have been on the theory that the pier was to be shedded by the city, for such was the legal obligation of the city to the defendant at that time. The lease which was finally negotiated was not only for a lower rental and a different part of the pier, but it included the bulkhead and was upon the basis that the French Line would erect the sheds, and it was for a different term in accordance with the new lease to be negotiated between the city and the defendant. I am of opinion therefore that the sublease made was so materially different, with respect to subject-matter, term, and rental, from the proposition which the plaintiff claims that he was authorized to make to the French Line, that he is not entitled to a commission thereon. Lord v. Citizens' Steamboat Co., 106 App. Div. 610, 94 N. Y. Supp. 98; Meyer v. Improvement Property Holding Co., 137 App. Div. 691, 693, 122 N. Y. Supp. 296; Freedman v. Havemeyer, 37 App. Div. 518, 56 N. Y. Supp. 97; Moloney v. Brennan, 138 App. Div. 510, 123 N. Y. Supp. 375; Phinney v. Chesebro, 87 App. Div. 409, 84 N. Y. Supp. 449; Cole v. Kosch, 116 App. Div. 715, 102 N. Y. Supp. 14. It seems to me that in any event the plaintiff would be limited to a recovery of commissions on two-thirds of the rent reserved in the sublease of three-fourths of the pier, because plainly that lease embraced one-fourth of the pier, viz., the inner half of the southerly half which he was not authorized to sublet.

Fourth. If Scholz employed the plaintiff and had authority to do so, still the contract was neither negotiated by the plaintiff, nor did he introduce or bring the parties together, and therefore he was not the procuring cause, and there can be no recovery. Hay v. Platt, supra; Wylie v. Marine Nat. Bank, 61 N. Y. 415; Chandler v. Sutton, 5 Daly, 112; Sibbald v. Bethlehem Iron Co., 83 N. Y. 373, 382, 38 Am. Rep. 441; Miller v. Vining, 112 App. Div. 304, 98 N. Y. Supp. 466; Freedman v. Havemeyer, supra; Phinney v. Chesebro, supra; Cole v. Kosch, supra. The services of the broker must be the direct and proximate cause, not the indirect accidental or remote cause of bringing the customer to his principal. Cole v. Kosch, supra; Meyer v. Improved Property Holding Co., supra; Boyd v. Improv. P., 135 App. Div. 623, 120 N. Y. Supp. 850; Sibbald v. Bethlehem Iron Co., supra.

Of course, where a broker advertises property, and a customer is procured thereby, that is the direct result of the efforts of the broker. Kiernan v. Bloom, 91 App. Div. 429, 86 N. Y. Supp. 899; Sussdorff v. Schmidt, 55 N. Y. 319. It is perfectly clear on uncontroverted evidence that the defendant was looking for a tenant for part of this pier, and that the French Line was looking for this particular pier before the attention of the plaintiff was drawn to the matter. The representatives of both companies had consulted the commissioner of docks, whose authority it was necessary for defendant to obtain, and who was most likely to have information on the subject of what piers could be had, long prior to this time, and the parties were brought together by him, and not even at the suggestion of the plaintiff before plaintiff was on any theory of the case authorized to submit or submitted any definite or complete proposition, the acceptance of which would have constituted a binding contract, and they then opened and continued negotiations themselves.

The rule is that where a broker procures a prospective customer, and the principal takes up the negotiations which result in a contract, even though the terms as to consideration are changed, the broker may recover his commission pro rata. Martin v. Silliman, 53 N. Y. 615; Southwick v. Swavienski, 114 App. Div. 681, 99 N. Y. Supp. 1079. But, if plaintiff were entitled to recover a commission based on the rental of the part of the pier which he claims Scholz placed in his hands so far as the same was embraced in the sublease made, still the law of the case embodied in the charge to the jury was as we have stated, viz., that even if plaintiff were employed, yet if the French Line did not accept the offer of three-fourths of the pier submitted by him, and no authority was given to him to offer the entire pier, then defendant was justified in regarding the authority it had given plaintiff as ended. The verdict would seem to indicate that the jury determined that plaintiff was authorized to rent the entire pier; but, as already shown, if such authority were attempted to be conferred at the outset, it was definitely withdrawn, and it was not renewed by the subsequent determination of the defendant to sublease the entire pier. It may well be, as indicated by the testimony of Cauchois, that the plaintiff's call on Cauchois expedited their coming together; but it was inevitable in the circumstances that they would meet with respect to this proposition, even had the plaintiff not intervened to precipitate it. According to his testimony which is uncontroverted, this pier was only suitable for two steamship lines doing business in this port. On seeing an item of news in a daily journal which plaintiff thought indicated that part of this pier might be for rent, he attempted to have an interview with the defendant through Scholz, who had no authority in the premises, and with one of the two only possible available tenants with respect to their business and plans and apparently offered his services to both. He could not thus debar defendant from exercising its constitutional right to dispose of its property with the consent of the city, to one of these two lines without incurring liability to him for commissions. The French Line would not accept the proposition which plaintiff submitted; but believing, notwithstanding the fact that he could obtain authority for no other proposition, that it might obtain an acceptable

proposition by direct negotiations with defendant, and having already had considerable negotiations with Bensel concerning the matter, Cauchois went to him, and he, having been long before applied to by both parties, arranged the meeting between their representatives. Where a broker by attracting attention to property interests a party, who refuses to negotiate through him, this does not entitle the broker to a commission if the principal in good faith thereafter negotiates a contract on the direct application of the party. Sampson v. Ottinger, 93 App. Div. 226, 87 N. Y. Supp. 796.

Assuming that Scholz employed the plaintiff, as claimed, there is no ground for a charge of bad faith on the part of the defendant in conducting negotiations directly with the French Line, through the intervention of Bensel. That was not done to deprive plaintiff of commissions, but in furtherance and execution of a determination arrived at by defendant before his first interview with Scholz. This case, therefore, is not within the rule that when a broken brings his principal and a customer together, and the negotiations are then taken out of his hands and conducted by the principal, resulting in a contract, he is entitled to his commissions (Carroll v. Pettit, 67 Hun, 418, 22 N. Y. Supp. 250), for here he did not introduce or bring them together; they took up no negotiations opened by him, and there was nothing to warrant him in suspending his efforts to obtain an acceptance of the proposition he had submitted. He claims to have continued active, but neither party held any further negotiations with him. Scholz would not, according to plaintiff's testimony, change his proposition, and that was not acceptable to or accepted by the French Line, and, if it was still being considered as plaintiff claims, it was only in the expectation of getting the entire pier which plaintiff was not authorized to offer. The plaintiff did not procure an acceptance of the only proposition he claims Scholz authorized him to submit, and it. was never accepted, and, since that was not owing to any fault on the part of the defendant, he has no just claim for a commission.

Fifth. If there be any evidence that the plaintiff was the procuring cause of the execution of the subleases which required the submission of that question to the jury as one of fact, the determination of the jury in favor of the plaintiff is against the preponderance of the evidence, which shows that he merely, at most, accelerated the meeting of the parties.

It follows therefore that the judgment and order should be reversed, and a new trial granted, with costs to appellant to abide the event.

McLAUGHLIN, SCOTT, and MILLER, JJ., concur.

INGRAHAM, P. J. I concur with Mr. Justice LAUGHLIN in the reversal of this judgment upon the grounds stated by him: First, that Scholz had no actual or apparent authority to make a lease on behalf of the defendant; and, second, that the plaintiff was not the procuring cause of the lease for the making of which he seeks to recover.